# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## O. H. PERRY TIE & LUMBER CO. v. REYNOLDS & BRO.

### March 13, 1902.

1. SALES—*Late Delivery—Waiver.*—The acceptance by a vendee of a late delivery will not be deemed a waiver of the consequent damages sustained by him, where it appears that there was no intention to waive such damages.

2. SALES—*Late Delivery—Demurrage—Damages.*—The vendee of goods may recover of his vendor, or set off against a demand for purchase money, reasonable demurrage and dead freight which the vendee has been compelled to pay in consequence of the failure of the vendor to furnish the goods within the time and in the quantity stipulated for.

3. CONTRACTS—*Breach—General and Special Damages.*—The damages which a party may recover for a breach of contract are such as ordinarily and naturally flow from its non-performance, which are proximate and certain, or capable of being made certain, and not remote, contingent, or speculative. If the contract be made with reference to special circumstances which fix or affect the amount of damages, such circumstances are regarded as within the contemplation of the parties, and damages may be assessed accordingly.

4. CONTRACTS FOR FUTURE DELIVERY OF GOODS—*Breach—Sub-Vendees—Damages.*—The measure of damages for the breach of an executory contract to sell and deliver personal property is usually the difference between the contract price and the market price, at the time and place of delivery, with interest. But if, at the time the contract is made, the seller knows that the goods are being purchased for the purpose of enabling the buyer to fulfill a sub-contract, he may reasonably be deemed to have made his contract in contemplation of that purpose, and to have assumed the risks thereby entailed, and, if he breaks his contract, damages for losses caused thereby, if not remote, contingent or uncertain, may be recovered.

And if in such case there is no market in which the buyer can readily obtain the goods, on the seller's breach of the contract, the buyer may either go into the market and purchase the best substitute obtainable, charging the seller with tne difference between the contract price and the price of the goods substituted, or he may abandon his sub-contract, and recover of the seller the loss of profits on the sale, and indemnity in respect of any damages (including costs reasonably incurred), or penalties which he has been compelled to pay for breach of his sub-contract; but unless the *amount* of the particular damages or penalties has been made known to the seller, the buyer is not entitled to recover their amount as a matter of right, though, if reasonable, the jury may assess the indemnity at that amount.

5. Sales—*Sub-Vendee—Special Profits—Mitigation of Damages.*—In order to entitle a buyer to claim exceptional profits arising from a subsale, express notice of the amount of such profits must have been given to the seller at the time when the contract was made, under circumstances implying that he accepted the contract with the special condition attached to it. And, in order that the buyer may recover the full amount of damages, he must have acted throughout as a reasonable man of business, and done all in his power to mitigate the loss.

6. Sales—*Case at Bar—Breach of Contract to Deliver—Sub-Vendees—Damages.*—In the case at bar a vendor contracted to sell a bill of lumber of particular sizes and lengths, to be delivered on board a vessel at a designated time and place, knowing that his vendee had contracted to deliver the lumber to a sub-vendee for a particular purpose, and at a designated time and place. The vendee chartered a vessel to carry the lumber, and had it ready at the time and place stipulated, but the lumber was not then delivered, and only a part of it was delivered about a month afterwards. The vendee was prevented from otherwise employing the vessel by the repeated promises of the vendor to deliver the lumber. In consequence of these defaults of the vendor, the vendee was compelled to pay demurrage and dead freight on deficiency in cargo, and damages for failure to fulfill his contract with his sub-vendee, and, in addition, lost the profits he would otherwise have made on his contract.

*Held:* It was not error to refuse to set aside a verdict in favor of the vendee for the above items of demurrage, dead freight, damages and loss of profits.

Error to a judgment of the Court of Law and Chancery of the city of Norfolk, rendered October 4, 1900, in an action of as-

sumpsit wherein the plaintiff in error was the plaintiff, and the defendants in error were the defendants.

*Affirmed.*

The opinion states the case.

*Edward R. Baird, Jr.*, for the plaintiff in error.

*Hughes & Little*, for the defendants in error.

BUCHANAN, J., delivered the opinion of the court.

About the 20th of August, 1898, the plaintiffs in error, who were the plaintiffs in the trial court, entered into a contract with the defendants by which they undertook to furnish two bills of lumber, one for forty thousand feet, and the other for about one hundred and thirty thousand feet, all to be delivered within thirty days at a wharf on James River on board of vessels to be provided by the defendants. None of the lumber was delivered within the time fixed by contract. The smaller bill was delivered on the 4th of October, in time for the purpose for which it was ordered, and about it there is no controversy. None of the other bill was delivered until November 6, and then only about one hundred thousand feet thereof, too late to reach New York in time for the defendants to comply with the terms of their contract for its sale, of which contract plaintiffs had notice when they agreed to deliver the lumber within thirty days. To recover the value of the lumber actually delivered, the plaintiffs instituted their action of assumpsit. The defendants filed their plea of non-assumpsit, but the defence relied on was a plea of offset in which they claimed damages which they offered to set off against the plaintiffs' demand. The damages claimed by the defendants consisted of three items:

1. Demurrage paid the vessel engaged to freight the lumber on account of delay caused by the plaintiffs' failure to deliver it in accordance with the terms of their contract.

2. The amount of money paid by the defendants to the party to whom they had resold the lumber as damages caused by the plaintiffs' failure to deliver within the time agreed on.

3. The profits which would have accrued to the defendants on their resale, and which they lost by the failure of the plaintiffs to deliver the lumber according to contract.

The jury, upon the defendants' demurrer to the evidence, found that if the law was for the plaintiffs, they were entitled to recover the sum of $1,118.33, with interest from November 7, 1898, but if the law was for the defendants, they were entitled to recover the sum of $156.50, with interest thereon from the 3d day of December, 1898. The court was of opinion that the law was for the defendants, and gave judgment in their favor for the last named sum. To that judgment this writ of error was awarded.

The first assignment of error is that the acceptance by the defendants of the lumber delivered at a time subsequent to that named in the contract for its delivery is an absolute bar to the recovery of damages for a failure to deliver within the time fixed by the agreement of sale.

The authorities are not agreed as to what is the effect of acceptance as a waiver of default as to the time of delivery. Lord Blackburn, in his work on Sales, p. 524, says that "when the contract was to deliver goods at a certain day, and that date is passed, the vendee may accept the goods and bring his action for any damages he may have actually suffered in consequence of the late delivery. He does not, by accepting a late delivery, waive any claim for damages arising from the delay."

Prof. Mechem, in his treatise on Sales, says: "Not all of the American cases lay down the rule in so unqualified a form, and much must depend upon the circumstances of each case. In many instances, the buyer is in such a predicament that he has practically no choice, and the true rule doubtless is that the acceptance does not constitute a waiver of damage for the delay,

in the absence of circumstances showing that such was the intention." 2 Mech. on Sales, sec. 1389.

It is unnecessary in this case to determine which of the two rules is based upon the better reason or sustained by the weight of authority, as it is clear that, whether tested by the one or the other, there was no waiver in this case. The correspondence and conduct of the parties not only fail to show any intention on the part of the defendants to waive the damages which had resulted or might result to them from the failure of the plaintiffs to deliver the lumber within the contract time, but, on the contrary, show that there was no such intention.

The next question is as to the validity of the items of damages claimed by the defendants.

The first item is $585 for demurrage paid the vessel engaged to carry the lumber. The evidence shows that the defendants made a verbal charter party with the captain of the vessel which they engaged to carry the larger bill of lumber from the point of delivery on James River to New York, which contract was afterwards reduced to writing, and was in the usual form. It provided for loading the lumber at the rate of thirty thousand feet per day; for the payment of demurrage at the rate of fifteen dollars per day for all days beyond that time; and for the payment of dead freight on the difference between one hundred and thirty thousand feet, the agreed cargo, and the amount actually delivered, at the rate of two dollars and fifty cents per thousand feet. The evidence further shows that the vessel was delayed at least twenty-eight days by the plaintiffs' failure to deliver the lumber; that the lumber when delivered was thirty thousand feet less than it ought to have been, and that the agreed rate for demurrage and dead freight was reasonable. The demurrage for twenty-eight days, at the rate of fifteen dollars per day, amounted to $420, and the dead freight on thirty thousand feet of lumber, at $2.50 per thousand, amounted to $75, the two sums aggregating $495. Not only were the de-

fendants bound for this sum by their contract with the captain of the vessel, but the vessel had a lien upon the lumber for it. *The Hyperior's Cargo,* 2 Lowell, 294; *The Maggie Hammond,* 9 Wall. 435. The defendants, having paid this sum, were entitled to recover it from the plaintiffs, or have it set off against their demand, as it clearly appears that it resulted from their failure to deliver the lumber according to the terms of the contract.

It is suggested that the vessel ought to have been used for some other purpose during this long delay, and thus avoided the payment of demurrage in whole or in part.

There would be much force in this suggestion but for the fact that the plaintiffs, after the time fixed by the contract for the delivery of the lumber had expired, by their assurances and representations, from time to time, induced the defendants to believe that the lumber would be delivered in a few days, or by the last of the week, or in a short time, and thus caused them to keep the vessel at the point of delivery ready to receive it.

The assignments of error as to the validity of the other items of damage claimed by the defendants will be considered together.

One of these items is the sum of $654.83 paid by the defendants to their sub-vendee as damages caused by the failure of the plaintiffs to deliver the lumber within the time agreed upon, and the other is $195, the profit which the defendants would have made on their resale of the lumber if the plaintiffs had fulfilled their contract.

The damages which a party may recover for a breach of contract are such as ordinarily and naturally flow from its non-performance, which are proximate and certain, or capable of being made certain, and not remote, contingent, or speculative. Parties are presumed to contemplate the usual and natural consequences of its breach when the contract is entered into. If made with reference to special circumstances which fix or affect

the amount of damages, such circumstances are regarded as within the contemplation of the parties, and damages may be assessed accordingly.

The measure of damages for the breach of an executory contract to sell and deliver personal property is usually the difference between the contract price and the market price at the time and place of delivery, with interest. But if at the time the contract is made the seller knows the goods are being purchased for the purpose of enabling the buyer to fulfill a sub-contract, he may reasonably be deemed to have made his contract in contemplation of that purpose, and to have assumed the risks thereby entailed, and if he breaks his contract, damages for losses caused thereby, if not remote, contingent, or uncertain, may be recovered. And if in such cases there is no market on which the buyer can readily obtain the goods, on the seller's breach of the contract, the buyer may, it is said in Benjamin on Sales, adopt one of two courses:

"He may elect to fulfill his sub-contract, and for that purpose go into the market and purchase the best substitute obtainable, charging the seller with the difference between the contract price of the goods, and the price of the goods substituted; or,

"He may elect to abandon his sub-contract, and is entitled to recover as damages from the seller his loss of profit on the sale, and further to be indemnified by him in respect of any damages (including costs reasonably incurred) or penalties which he has been compelled to pay for breach of his sub-contract; but unless the *amount* of the particular damages or penalties has been made known to the seller, the buyer is not entitled to recover their amount as a matter of right, though if reasonable the jury may assess the indemnity at that amount.

"But in order to entitle the buyer to claim exceptional profits arising from a sub-sale, express notice of the amount of such profits must have been given to the seller at the time when the contract was made, under circumstances implying

that he accepted the contract with the special condition attached to it.

"And in order that the buyer may recover the full amount of damages, he must have acted throughout as a reasonable man of business, and done all in his power to mitigate the loss."

See Benjamin on Sales (7th ed.—Bennett's), pp. 933-4; and 2 Mechem on Sales, sections 1763 to 1776, where numerous cases, English and American, are cited.

In *Hinde* v. *Liddell*, L. R. 10 Queen's Bench, 265, the sellers had contracted to supply the buyer with gray shirting by the 20th day of October. They were informed generally that the goods were intended for a foreign market, but had no particular information of the sub-contract which the buyer had made. Shortly before the time for delivery the sellers notified the buyer that they would be unable to complete the contract. There being no shirtings upon the market of the kind contracted for, the buyer procured shirtings of a better quality, at a higher price, in order to perform his sub-contract, but received no advance in price from his vendee. It was admitted at the trial that the shirtings purchased by the buyer were the nearest in quality and price that could be obtained in the market for delivery by the 20th of October. The court held that the buyer was entitled to recover the difference between the price paid for the substituted shirtings, and the seller's contract price. It was said by Blackburn, J., during the argument, that "There was no market for this particular description of goods, and therefore no market price; in such a case, the measure of damages is the value of the thing at the time of the breach of contract, and that must be *the price of the best substitute procurable. Barnes* v. *Hutchinson*, 18 C. B. (N. S.) 445, is directly in point. How does this differ from the case of a carrier who fails to carry a passenger to a given public place, in which case the passenger has been held over and over again to be entitled to take the best substitute in the shape of a conveyance he can get, no matter that it costs more than the fare?"

In *Elbinger etc. Company* v. *Armstrong*, L. R. 9 Q. B. 473, the seller had agreed in January to supply the buyers with a certain number of wheels and axles according to tracings, to be delivered in stated quantities and at stated intervals in the months of February, March, and April, free on board of vessel at Hull. The buyers were under contract with a Russian railway company to deliver them one thousand wagons, five hundred on May 1st of that year, and five hundred on May 31st of the next year; and they were bound to pay two roubles per wagon for each day's delay in delivery. The seller was informed of the sub-contract, but the precise days for delivery, and of the amount of the penalties, were not mentioned. Delay occurred in the delivery of the first instalment of wheels, and the seller in consequence became liable for the penalties, but the Russian company consented to take one rouble a day, amounting in the aggregate to one hundred pounds. The buyer, having brought his action against the seller for the delay, sought to recover as damage the one hundred pounds. The court held that the buyer was not entitled to damages to the amount of the penalties as a matter of right, but that the jury might reasonably have assessed the damages at that amount. Substantially the same ruling was made in *Grebert-Borgins* v. *Nugent*, 15 Q. B. Div. 85, and the case of *Elbinger* v. *Armstrong* was approved.

In the case of *Booth* v. *The Spuyten &c. Co.*, 60 N. Y. 487, the plaintiff, having contracted to sell and deliver to a railroad company four hundred tons of rails made of iron with steel caps, entered into a contract with the defendant to furnish the caps, the latter being informed for what purpose they were wanted. In consequence of the defendant's failure to perform its contract, the plaintiff was unable to fulfill his contract with the railroad company. The court held that, in the absence of proof that the price plaintiff was to receive was extravagant, or of unusual or exceptional character, he was entitled to recover, as damages,

the profits he would have realized; and that the fact that the price was not communicated to the defendant (it appearing that the rails were a new article having no market value), did not change the rule of damages.

It appears that the defendants, at the time they made their contract with the plaintiffs in the case at bar, had agreed to furnish to a party in New York the lumber contracted for, which was a special bill for a special piece of work, to be delivered by the 5th of September. Under the continued and repeated assurances of the plaintiffs that the lumber would be delivered in a few days, or in a short time, the defendants induced their vendee, to whom these assurances were communicated, to give further opportunity for the plaintiffs to deliver the lumber. Relyea, the defendants' vendee, under these assurances and representations, awaited the delivery of the lumber until about the 9th of November, when, finding that he could no longer delay the work for which the lumber was ordered, cancelled his contract and went upon the market, and, not being able to duplicate the lumber, which was of special sizes and lengths, purchased the best substitute obtainable, and charged the defendants with the difference between the price at which they had agreed to furnish the lumber, and the price of the substituted lumber. This difference amounted to about eleven hundred dollars. But in a compromise settlement between the defendants and their vendee, Relyea, the latter accepted $654 in full satisfaction of his damages, which was paid by the defendants and charged to the plaintiffs, together with the profits which the defendants would have made upon their contract with Relyea if the plaintiffs had delivered the lumber according to contract.

It clearly appears from the defendants' evidence that whilst the price paid by Relyea for the substituted lumber was much higher than his contract price of the lumber the defendants were to furnish, it was as near like it as could be had upon the

market, and was purchased upon the best terms it could be had under the circumstances.

The plaintiffs did not contradict this by any testimony, nor did they attempt to show that the substituted lumber could have been purchased for any less, or that the defendants could in any reasonable manner have reduced the amount which they paid as damages to their sub-vendee.

The profits which the defendants would have made on their sale to Relyea was $1.50 per thousand feet, less than fifteen *per cent.* on what they had agreed to pay the plaintiffs for the lumber and the costs of transporting it to New York, or $195 on the one hundred and thirty thousand feet of lumber. This was not an unreasonable, certainly not an extravagant, profit. *Booth* v. *Spuyten &c. Co.* 60 N. Y. p. 495.

The evidence shows that the defendants did not realize as much, or at least any more, out of the one hundred thousand feet which was delivered to and accepted by them than it actually cost them. The actual loss, therefore, which resulted to them from the plaintiffs' breach of contract was the $495 which they properly paid as demurrage and dead freight, the $654 paid as damages to their sub-vendee, and the $195 profits which they would have made upon their resale to him. The amount found by the jury in favor of the defendants was a little less than the aggregate amount of these sums, after deducting therefrom the entire demand sued for by the plaintiffs.

We are of opinion, therefore, that there is no error in the judgment complained of to the prejudice of the plaintiffs, and that the same should be affirmed.

*Affirmed.*