# CHARLESTON

## STATE *v.* HARMAN.

Submitted January 25, 1905.   Decided March 21, 1905.

1.  FORFEITED LANDS—*Tax Titles—Tender of Purchase Money.*
    In a bill by the state to sell forfeited land and annul a tax deed constituting title hostile to that of the state, it is not necessary that there should be a tender by the State of the taxes paid by the tax purchaser, under section 25, chapter 31, Code.   (p. 451.)

2.  FORFEITED LANDS—*Conflicting Titles to be Settled in Suit to Sell.*
    Conflicting titles to land may be adjudicated in a suit in equity by the state to sell forfeited land under jurisdiction given by chapter 105 of the Code.   (p. 451.)

3.  TAX TITLE—*Deed Void for Irregularities.*
    A tax deed made in 1870 is void, because there was no affidavit to the list of sales of delinquent lands, and the list was not returned to the recorder's office within ten days, and no note of its return was made by the recorder, and there was no surveyor's report.   (p. 452.)

4.  TAX TITLE—*Deed Must be Acknowledged or Proven.*
    A tax deed must be either acknowledged or proven before it can be recorded.   If recorded without such acknowledgment or proof, it passes no title   (p. 452.)

5.  STATUTE CONSTRUED.
    Sections 25 and 53, chapter 31, Code 1899, are not retroactive. They do not cure void tax deeds made prior to the enactment of the provisions therein.   (p. 454.)

6.  *Quaere.*   Can the Legislature pass an act curing defects in a past tax deed which rendered it void by the law in force at its date?  (p. 457.)

7.  TAX SALE—*Title of Purchaser and Former Owner Hostile.*
    The title of the purchaser at a tax sale is not the same as that of the owner in whose name the land was sold.   They are separate, hostile claims, with no privity between them.   (p. 457.)

8.  TAX SALE—*Void Tax Deed no Protection to Former Owner.*
    If a tax deed is void, passing no title, and the owner in whose name the land was sold omits to keep the land on the tax books in his own name, his title will be forfeited for five years omission. Payment of taxes in the name of the tax purchaser will not prevent such forfeiture.   p. (457.)

9.  TAX DEED NOT A GRANT.
    A tax deed is not a "grant" under the second classification of persons entitled to transfer of State title in Art. 13, section 3, of

the Constitution; but it is good "claim" and "color" of title under the first and third classifications of said section. (p. 460.)

10. VENDOR AND VENDEE.

Possession by a vendee under an executory contract of sale of part of a tract of land is the possession of the vendor. (p. 462.)

11. ACTUAL POSSESSION—*How Far it Extends.*

Actual possession within one of two or more adjoining tracts of land of the same owner is possession of all of them. (p. 463.)

12. VENDOR AND VENDEE—*Actual Possession—Sale of, What Transferred.*

When one in actual possession of a tract of land conveys legal title to that portion on which is the actual possession, his constructive-actual possession of the residue of the tract ceases. It is not so, if the owner sells such portion by executory contract. (p. 464.)

13, FORFEITED LANDS—*Possession.*

The possession to call for transfer to one title of another title forfeited to the State need not be by the person himself claiming such transfer, but may be by a tenant or vendee under an executory contract. (p. 466).

14. *Quaere.* A man owns a tract of land. He conveys the legal title to part of it to another man. The grantor is not in actual possession of the residue, but the owner of the part conveyed away is in actual possession of his part. Does the possession of such part constitute possession of the residue for the owner of the residue, so as to enable that owner to take the benefit of a forfeited title under the Constitution, Article 13, section 3? (p. 465.)

15. FORFEITED LANDS—*Transfer of Title From State, Conditions.*

To enable one to take the benefit of a transfer of a forfeited title to land under Art. 13, section 3, of the Constitution, it is not required that he shall be, by payment of taxes and possession, in a condition to take the benefit of such transfer at the date when forfeiture vests title in the State. If he shall be in such condition at any time while title remains in the State, he gets such transfer. (pp. 466, 467.)

16. CONSTITUTION.

Article 13, section 3, of the Constitution, is not repugnant to amendment 14 of the United States Constitution. (p. 468.)

17. ADVERSARY POSSESSION—*Runs Against State.*

The statute of limitations under adversary possession runs against the State as to its land not used in governmental administration. (p. 469.)

18. FORFEITED LANDS.

When the title of the State to land vested in it by forfeiture has been transferred to a person by force of section 3, Art. 13, of the Constitution, the State cannot sell the land as forfeited, by proceedings under chapter 105 of the Code. (p. 459.)

19. FORFEITED LANDS—*Proceedings to Sell by State—Limitation.*

The State cannot have a decree to sell land as forfeited in a proceeding to sell it under chapter 105 of the Code, when the state has made one claiming the land a party and has brought his claim before court for adjudication, and contests his right, and his title is found superior to that of the State by reason of the statute of limitations. (p. 469.)

20. TAX DEED IS GOOD COLOR OF TITLE.

A void tax deed is good color of title both for the purposes of section 3, Art. 13 of the Constitution, and the statute of limitations. (p. 470.)

SANDERS, JUDGE, Absent.

Appeal from Circuit Court, McDowell County.

Bill by the State against H. A. Harman and others. Decree for defendants, and plaintiff appeals,

*Affirmed.*

CHAPMAN & GILLESPIE, PRICE, SMITH & SPILLMAN, and MOLLOHAN, MCCLINTIC & MATHEWS, for the State.

J. S. CLARK and A. W. REYNOLDS, for appellees.

BRANNON, PRESIDENT:

The Commonwealth of Virginia issued five grants or patents for lands at their dates situate in Tazwell county, now in McDowell county, one to H. A. Harman, Erastus F. Harman and Isaiah Smith for two thousand acres; and one to the same persons for two thousand and two hundred and ninety-five acres; which two tracts are those involved in this suit. There were also issued three other grants or patents, one to Edwin L. Parker, Hezekiah A. Harman and John H. Parker for one thousand four hundred and twenty acres; one to Steven S. Taylor and H, A. Harman for one thousand seven hundred and sixty-six acres; and one to W. C. Badow, H. A. Harman, Anthony Sisler and Pater Bonticon for twenty-five hundred acres. The five tracts adjoin. Said five tracts were sold in McDowell county in 1869 for delinquent taxes and,

purchased by John H. Divine, who in 1870 obtained from the recorder of McDowell county a deed for each tract under said tax sales, which deeds, without being acknowledged or proven, were recorded in the recorder's office. Divine under his tax title took possession at many points on the tract made up of the five tracts. He made contracts with divers persons providing that they should take possession under him and improve each a part of the land and remain in possession five years, and that then Divine should convey one hundred acres to each one, to be selected by the settlers. Under these contracts these settlers entered, improved and lived on numerous parcels, some inside each of these tracts. Some of these settlements date as far back as 1876. Divine made deeds to some of them, but not to some others. Divine and his successors have since 1870 paid all State taxes on all said lands. After the tax sales the lands were omitted from the tax books in the names of the former owners, and they were forfeited for such non-entry several times over, the first forfeiture becoming complete not later than the close of the year 1875. John H. Divine's title came to Silas R. Divine, by deed, December 14, 1885, which excepted a number of those improved parcels, and he sold all the five tracts to E. W. Clark, S. F. Tyler and H. M. Bell, trustees of the Flat-top Land Trust, by executory contract dated 12th October, 1887. A number of the small tracts which had been sold to those settlers were also excepted from this contract. Silas R. Divine, by deed, April 12, 1889, conveyed to the trustees, called the trustees of the Flat-top Association, the lands which he had sold to them by said contract. This deed conveys all said five tracts, excepting fourteen of said small settled parcels. Said trustees in 1888 obtained deeds from a number of said settlers for the small tracts which John H. Divine had sold them. Some of them were purchased before, some after the deed from Silas R. Divine to the trustees. The trustees continued in possession. In January, 1894, the State of West Virginia filed a bill in equity in the Circuit Court of McDowell county against H. A. Harman and the heirs of E. F. Harman, stating that the tracts of two thousand and two thousand, two hundred and ninety-five acres had been forfeited for non-entry, and asking that they be sold as forfeited land for the benefit of the school fund. Later other

parties defendant were made by amended and supplemental bills. The trustees, 14th September, 1894, filed their petition asking to become parties, and set up their tax title and claiming that by ten years possession and payment of taxes their title had become good and protected by the constitution and laws of West Virginia, and denying any title in the state to be sold as forfeited. The state in amended and supplemental bills attacked the tax deed made to John H. Divine as defective and void, and denied that the trustees had acquired title to the lands under the constitution or statute of limitations. K. R. D. Harman and others claiming under the the grant to Harman and others of the two tracts filed a petition, admitting that their title had become forfeited to the state by omission from the tax books, and asking to be allowed to redeem. A decree was pronounced which dismissed the state's suit, and the state appeals.

As in the case of *State v. Jackson*, 56 W. Va. 558, (49 S. E. 465,) this is a suit in equity, under the jurisdiction given by chapter 105, of the Code, to sell land as forfeited to the state for non-entry on the tax books, in which the right of claimants adverse to the state may be tried, and the liability of the land to sale as forfeited may be tested. So, this is a suit to try title between the state and the trustees of the Flattop Association.

First, it is claimed that the bill was rightly dismissed for want of tendering to the claimants of the tax title the taxes and interest required to be refunded by chapter 31, section 25, Code. We have decided that this is necessary in case the purchaser is an individual. *McClain* v. *Batton*, 50 W. Va. 121. The statute demands this of a "person." We do not think the statute applies to the State. Who will furnish the money? The Legislature would have to appropriate it. We think that it is the prerogative of a State to sue without such tender. The purchaser must look to after legislation to reimburse him.

The following questions are prominent. Did the state have title under forfeiture which would authorize her to ask a sale, or to allow the former owners to redeem? Or had the title of the former owners passed by the tax deeds to John H. Divine, leaving no title in the former owners to become forfeited to the State for non-entry? If no title

passed by the tax deeds to Divine, so that it remained in the former owners under the Harman grant, and became forfeited, did it later pass to the trustees by transfer of the forfeited title, under section 3, art. 13, of the Constitution, or by their adverse possession under the statute of limitations? If the State had not title, then it followed that she could not have a decree to sell, nor could the Harmans redeem. *State* v. *Jackson.* 56 W. Va. 558, (49 S. E. 465;) *State* v. *Collins*, 48 W. Va. 64. Have the trustees good title under the tax deed to John H. Divine?

The trustees of the Flat-top Association rely for title over the State on the tax deeds to Divine. These tax deeds were void, tested by the law in force in 1870. Code 1868, chapter 31. There was no pretense of affidavit to the list of sales of delinquent lands. The list was not signed by the sheriff.

So, there was no sale list at all—the paper not official, mere vacancy. It gives no estate sold—no separate amount of taxes. It is vacancy. *Mosser* v. *Moore*, 56 W. Va. 478, (49 S. E. 537). The sale list was not returned to the office of the recorder within ten days, nor did the recorder note the date of its return. I need not go into detail to show that the tax deeds were void by the then law under numerous cases. *McAllister* v. *Cottrill*, 24 W. Va. 173; *Barton* v. *Gilchrist*, 19 *Id.* 223; *Simpson* v. *Edmiston*, 23 *Id.* 675; *Jones* v. *Dils*, 18 *Id.* 763; *Burlew* v. *Quarrier*, 16 *Id.* 110.

There was no surveyor's report. This invalidated the deed under *Forqueran* v. *Donnally*, 7 W. Va. 114.

The tax deeds are also inoperative to give title because recorded without acknowledgment. The Code of 1868, chapter 31, section 19, provides that the recorder shall make the deed, and section 25 provides that when the tax purchaser shall obtain from the recorder a deed and cause "the same to be admitted to record in the office of the recorder," then certain title passes to him, neither section saying that the deed shall be acknowledged. So with section 20 when the circuit clerk makes the deed in place of the recorder. If that were all, perhaps acknowledgment could be dispensed with, though when we speak in the Virginias of "recording" a deed we mean after acknowledgment—so much so that we may say that the verb "record" in a statute relating to record-

able papers has a technical meaning, the legal registry of an acknowledged or proven paper. The only argument to the contrary is that the recorder is an official, and he knows his own signature, or its verity would be taken without proof, and why acknowledge his own deed? But we must read other parts of the Code. It is certain that the deed is to be recorded. After the recorder makes the deed, he delivers it to the purchaser. The act of recording is a different, separate act. How is that done? The act is governed by law. Chapter 73, section 2, must be considered. It says: "The clerk of the county court of any county in which any deed, contract. power of attorney, or other writing is to be, or may be recorded, shall admit the same to record in his office as to any person whose name is signed thereto, when it shall have been acknowledged by him or proved by two witnesses as to him, before such clerk of the county court." Section 3 allows recordation on specified other acknowledgments. The recorder could not admit a deed to record, not acknowledged or proven as directed by that section. If he should do so, it would not be a recorded paper. The deed book containing it, or a certified copy of it, would not be admissible evidence under chapter 130, section 5, Code as often held by the courts, because not legally recorded. The recording section requires the certificate of acknowledgment to be recorded as well as the deed. The act of recording papers is the creature of statute, and the statute must be followed by the recorder, and that allows him to record a paper only when acknowledged or proven, certainly to give the record legal force. *Warren* v. *Syme*, 7 W. Va. 474, point 4. So, the recorder has no title in him. He makes a tax deed only officially. The obtaining of title by tax sale comes only of statute law, and Code 1868, chapter 31, section 25, says that when the purchaser shall have obtained the recorder's deed, "and caused it to be admitted to the record, * * * such estate shall stand vested in the grantee" etc.; so that only after recordation does the deed pass title, by the letter of the section, and it cannot be put on record without acknowledgment. It is different with an individual's deed, as it is a personal act, passing title by his own seal, not dependent on acknowledgment, but good without it, and only recorded to give notice of its existence to creditors and purchasers from

the same grantor, good by common law, whereas the recorder's deed is operative only from statute. Section 22 provides that in certain contingency the court shall appoint a commissioner to make the same deed. I suppose it would hardly be contended that the commissioner need not acknowledge it. On a similar statute it has been held that a clerk must acknowledge a tax deed, else it is unavailing. *Leftwich* v. *City*, 100 Va. 164, (40 S. E. 651).

But it is insisted by the trustees that the void deeds are cured by section 25, chapter 31, Code, as re-enacted by chapter 130, Acts 1882, as found in Code editions of 1887, 1891. 1899. It is insisted that section 53 is retroactive, and applies the curing provisions of section 25 to past deeds, and cures these deeds of their defects, makes deeds that were void when made valid and effectual to pass title 12 years later. Section 53 enacted in 1882 is as follows: "Deeds for real estate sold for the non-payment of the taxes thereon, before this chapter as amended takes effect, shall be made, and real estate heretofore sold shall be redeemed under, and be governed in all respects, by the provisions of this chapter as amended." To make the section retroactive we must get over that great volume of decided cases holding that "Statutes not expressly made retrospective in terms are otherwise construed, if possible; and where retrospective are construed as narrowly as possible." 8 Cyc. 1022. Statutes are to operate in future and are never given construction to operate on past transactions, "unless such construction is absolutely necessary to give meaning to the language used." This last strong statement in 6 Am. & Eng. Ency. L. (2 Ed.) 939, is not too strong under the authorities. Many Virginia and West Virginia cases so hold. *Sharp* v. *Shenandoah Co.*, 100 Va. 27 (40 S. E. 103;) *Stewart* v. *Vandervort*, 34 W. Va. 512; *Fowler* v. *Lewis*, 36 *Id.* 112; *State* v. *Mines*, 38 *Id.* 125. In *Collins* v. *Sherwood*, 50 W. Va. 133, we held that section 25 is not retrospective. We should not overrule that holding, unless entirely convinced that it is wrong. We are not. Following law above given, we say that it is not "absolutely necessary to give meaning to the language" of section 53 to say that it is retrospective, as we can give it fair construction without doing this. It was a fact known and told by section 53, that before its enactment lands had been sold for which

deeds had not yet been made, and as the act of 1882 was a
new act it was thought prudent to provide for the execution
of deeds under those past sales. So also with redemption under
those sales. The word "governed" only says that the re-
demption should be regulated by the chapter as amended.
The language "sold for non-payment of taxes thereon be-
fore this chapter as amended takes effect," does, it is true, re-
late to past sales, but only so far as to provide for deeds under
them. So in the next clause, the words "real estate hereto-
fore sold" relate to past sales, but only to provide for their
redemption, where the right existed. These clauses are
clearly limited to past sales not yet executed. The word
"governed" relates to the same subject, and surely is not
plain enough in backward operation to justify us in saying
that it cures sales already closed by deeds, It says real es-
tate sold shall "be governed by the provisions of this chap-
ter." Does this say that tax deeds before made shall be so
governed? If that was the thought, why was it not made
plainer? That word "governed" must be read in connection
with other words. merely meaning that the execution of deeds
or making redemption under past sales should be regulated
as to procedure by the new chapter. The section provides
for two future acts, the execution of deeds and redemption,
both limited to sales not yet executed by deed, and these acts
"shall be governed in all respects by the provisions of this
chapter." They are the only acts to be "governed" by the
new chapter. As section 53 does not make the curing pro-
visions of section 25 apply to past deeds, the latter section
does not touch them. It is useless to rely on the following
part of section 25 as retrospective in itself: "But no sale or
deed of any such real estate under the provisions of this chap-
ter shall be set aside, or in any manner affected by reason of
the failure of any officer mentioned in this chapter to do or
perform any act or duty herein required to be done or per-
formed by him after such sale is made, or by the illegal or
defective performance, or attempt at the performance, of
any such act or duty after such sale, or by reason of the con-
veyance by the deed hereinbefore mentioned and prescribed.
of a less quantity of real estate than that mentioned in the
list of sales made out and returned as provided in the twelfth,
thirteenth and fourteenth sections of this chapter, if the real

estate so conveyed by such deed be, in fact, the same which was sold as delinquent." It is plainly prospective in words, and the rule that statutes are *prima facie* prospective would deny it retroaction. It says that "no sale or deed under the provisions of this chapter shall be set aside." Does not this mean sales or deeds thereafter made under the chapter as re-enacted? And then it speaks of acts after such sale "*is* made." The word "is" does not relate to past sales. Therefore, we hold that the curing provisions of section 25, as enacted in 1882, do not apply to sales closed by deeds before 1882. Can we conceive that the Legislature intended to reopen transactions completely closed? It would require indubitable words to have such effect. How far back would these curing provisions go? They would go back as far as the date of the Code of 1868. If we give this retroactive effect to section 53, we resurrect from the grave hecatombs of void and dead deeds, put flesh on dry dead bones, revivify them, to unsettle titles and open a veritable Pandora's box to afflict the state in interminable litigation* and complication of titles. We decline, in the absence of plain and imperative retroactive language, to give such retroaction to sections 53 or 25. I cannot consent to the proposition, that hundreds and thousands of tax deeds, void by the statutes in force when those deeds were made, can be made valid by after legislation, even if section 53 were in letter retroactive. My land is sold for taxes to-day. The sale and deed by the statute to-day are void, so that my title remains in me not impaired by the tax sale. Next year—or many years hence— an act is passed curing the defect in the tax sale, making the sale and deed good. Until that act, my title was yet in me; I had a good defence against that tax deed; but that defence is taken from me—my land is taken from me. Can this be due process of law under the 14th amendment of the federal constitution or Art. 3, section 10, of the State Constitution, that "no person shall be deprived of life, liberty or property without due process of law?" The effect of the deed was a legal question to be decided by the judiciary; but the legislature violates that other provision of the constitution that one department shall not exercise the powers of another, and passes judgment that such tax sale shall be good. I do not forget that there is a rule that curative acts are, in cases,

valid—in cases where they only cure what the legislature might have in advance dispensed with. I doubt whether this rule would go to the extent to which it is sougbt to carry section 53 in this case, and that, too, by far fetched construction. I say I gravely question whether the Legislature could by plain words do so; but it is not necessary to pass on this matter, since we hold against such construction of the statutes; but such results as would come from the construction imparting to the statute retroaction, the extinction of lawful defences. against old tax deeds, the deprivation of vested property rights, are strong reasons against treating section 53 as retroactive. I regard this matter rather plain, and have only said too much upon it as it is relied upon with confidence.

Have the trustees of the Flat-top Association title under section 3, Art. 13, of the Constitution? All concede that after the tax sale to Divine in 1869 the lands were not on the tax books in the names of the former owners, and became forfeited at the close of the year 1875 for non-entry. Though the lands were on the tax books of 1870 and every year since in the name of the tax purchaser, John H. Divine and others claiming under his title, yet payment under that assessment of taxes did not enure to the benefit of said former owners, and such title as was in them was not saved from such forfeiture thereby. *Simpson* v. *Edmiston*, 23 W. Va. 675. That case holds that the title of the tax purchaser and that of the former owner are two distinct, separate titles, not in privity one with the other, but hostile and adverse. The tax sale gives birth to a new title, not the same as that of the former owner. They are not of kin to each other. Much authority sustains this position. It may be regarded somewhat anomalous, but it is settled law. The Iowa statute says that the tax deed shall "vest in the purchaser all right, title, interest and estate of the former owner," as our statute says in section 25, chapter 31, Code, that the tax deed shall give the purchaser "such right, title and interest in and to the real estate, as was vested in the person charged with the taxes thereon for which it was sold." It might seem that the purchaser takes the same title as vested in the former owner; that the former owner loses title and that the same title goes to the purchaser; but the law does not say

so. The U. S. Supreme Court. in *Hussman* v. *Durham*, 165 U. S. 147, passing on the Iowa act, declared that there was no privity between the former owner, and the tax purchaser. The Iowa Court says that the two titles are without privity, and that the tax title is a new and independent title. *Coom* v. *Cotting*, 22 Iowa, p. 411. The case of *Gwinne* v. *Niswanger*, 20 Ohio, 562 says: "We are of opinion that much of the difficulty in this case arises from attempting to make a tax title analogous to an ordinary chain of title. A tax title from its very nature has nothing to do with the previous chain of title, does not in any way connect itself with it. It is a breaking up of all previous titles. The party holding such title, in proving it goes no further than his tax deed; the former title can be of no service to him, nor can it prejudice him. It was well said by counsel in argument on the point, that a tax sale operates on the property not the title. In an ordinary case it matters not how many different interests may be connected with the title, what may be the particular interest of the party, in whose name the property may be listed for taxation; it may be a mere equitable right, if the land be regularly sold for taxes, the property accompanied with a legal title, goes to the purchaser, no matter how many estates, legal or equitable, may be connected with it." Black on Tax Titles. section 420, so states the law. Also Cooly on Taxation, 960. Under our law a tax sale gives the purchaser the land released of liens binding it in the hands of the former owner. If the owner owns only equitable estate, the tax purchaser could not on any idea of privity force the holder of the legal title to convey to him. The sale passes all other titles not charged. All liens on the land are drowned. If the former owner's deed contains covenants binding him, or running with the land, or placing a lien on it, the tax purchaser takes free of them. These considerations repel the idea of mere succession in estate or privity between the former owner and the tax purchaser. *Simpson* v. *Edmiston*, 23 W. Va. 675, holds that the state may rightfully collect taxes on the title of the former owner and also on that of the tax purchaser, they being two different titles, and therefore the omission of these lands in the names of former owners forfeited them, though owners of the very same lands. If the tax deed was valid, sale forfeiture would not give good title; the

tax purchaser would have that. If the tax deed was void, the sale would pass good title. So, the state had title by forfeiture of the former owner's title.

The Flat-top trustees claim that they had this forfeited title by possession and payment of taxes under the tax deeds to Divine. If so, the state had no title to sell, and the circuit court properly dismissed her suit. *State* v. *Jackson*, 56 W. Va. 558, (49 S. E. 465); *State* v. *Collins* 48 *Id.* 64. Said trustees claim the benefit of the forfeited title under all three of the classifications of persons taking such benefit under section 3, Art. 13 of the Constitution. As to the claim presented, but seemingly not confidently urged, that the trustees got the forfeited title under the second classification, we cannot sustain the claim. The clause says that the state's title "shall be and is hereby transferred to and vested in any person *** for so much of said land as such person shall have title or claim to, regularly derived, mediately or immediately from, or under a grant from the Commonwealth of Virginia or this state" etc. The want of the trustees in coming under this clause is a "grant from the Commonwealth of Virginia or this state." They have only a tax deed. At times the question has occurred to me whether a tax deed is not a grant under this clause. Not that it is itself a grant from the state, but whether, under the words "mediately or immediately," the tax purchaser cannot say that he claims under and through the original grant conferring the title under which the tax sale was made; but to say this we must make the title of the tax purchaser have privity with the title of the former owner, which is a proposition contrary to the rule that the two titles have no privity, but are foreign to each other. The tax deed cannot be, in and of itself, a grant. It does not give the state's title. By the sale the owner's title is sold, not the state's title. The State is only enforcing a lien for taxes on the owner's property, not selling her right. She makes no warranty by a tax sale, since she is selling only the individual's right, not her own. In *Rich* v. *Braxton*, 158 U. S. 405, it is distinctly held that a West Virginia tax deed is not a "grant" under the clause of the constitution in question. A grant conferring state title to land has a technical meaning under Virginia and West Virginia law. A public grant, not a private one, means an in-

strument by which the State as sovereign passes to an individual title to land before vested in the State. "A public grant is the mode and act of creating a title in an individual to land which has previously belonged to the government." 1.Bouvier Law Dic. 721; 2 Minor's Inst. 985. A patent is only another name for a land grant. The instrument is indfferently called a patent or grant in the Virginias. The particular form of what is strictly a grant for land is given in 1 Rev. Code of 1819, 334. It was signed by the governor. It is contended that under the clause of section 3, Art. 13, that that grant, that technical grant, is the one, the only one, referred to. We cannot so see it. In *State* v. *Jackson,* 56 W. Va. 558, (49 S. E. 465,) we held that a deed from a commissioner of school lands is a "grant" under said section. Our reflections were that the intent of that clause was to confer on the persons coming under it state title acquired by forfeiture, or waste or escheated land; that was the plain aim, and the clause ought to be liberally construed to carry out the state beneficence, liberality or grace, and to merge and settle contesting titles. What matters it about the mere mode or form by which the state confers her title which is to take to itself another forfeited title, so there is some state act giving that title? Before the constitution of 1863 state land was obtained by warrant, entry, survey and in the end grant. Section 2, Art. 9, of that Constitution stopped this by prohibiting future entry, and thus prohibited future grants, except those to execute past entries. The Constitution of 1872, section 2, Art. 13, also prohibited future entry or grant; but in section 4 provided that all state lands, not redeemed, released or *transferred* should by court proceedings be sold. Thus, the grant system before prevalent went away, and the Legislature by chapter 105, Code 1868, and chapter 134, Acts 1872-3, and other later acts, established the process of *sale* of such land under court decree, now found in chapter 105, Code. In such proceeding a decree of sale is to be made, to be executed by a deed from the commissioner of school lands by his conveyance to the purchaser. This is the system performing the function of disposing of state land substituted by the Legislature for the former pernicious entry system, under which sometimes the ground was covered by entries half a dozen deep, germina-

ting the most frightful complication of titles, disastrous alike to state prosperity and individuals. The present system is better. Anyhow, it stands in place of the entry and grant system, and shall it not be equally efficient to confer state title as was the grant? Why does not the commissioner's deed confer State title? It does pass "all right, title and interest in the state," by the letter of Code, chapter 105, section 15. Then, where the reason to deny, as some do, that such a deed shall not operate like a grant under section 3, Art. 13, clause 2? I think a grant by Legislative act, or a grant effected by the transfer of title by section 3, Art. 13, would also operate as a grant under that section. But a tax deed is not a state's grant, and therefore what I have said above as to a commissioner's deed is not material in this case, though somewhat cognate.

As I have above said, the question is whether the trustees of the Flat-top Association can, by payment of taxes and possession, get the benefit of the State's forfeited title. They cannot under the second clause of persons specified in section 3, Art. 13, for want of a grant. Then, can they do so under the first classification of said section, which says that the state's title "is hereby transferred to and vested in any person * * * for so much thereof as such person has, or shall have had, actual continuous possession of, under color or claim of title, for ten years, and who, or those under whom he claims, shall have paid the state taxes thereon for any five years during such posssssion"? J. H. Divine settled numerous persons at different times upon these wild lands. having brought them from New York to colonize them. They made improvements on all the tracts, some on one, some on another, cleared parts of the land, built houses and lived upon it, and had possession actual. Divine made written contracts with them to the effect that Divine agreed to let the settlers "select one hundred acres of land on any part of the tract owned by the party of the first part in McDowell county, and he agrees to erect a house on the same, and clear and cultivate when he can conveniently, and occupy the same for five consecutive years, when the party of the first part agrees to give a good and sufficient warranty deed for said one hundred acres of land." Of course, these people being in possession, under an executory contract, their possession was the possession

of Divine, because the possession of a vendee, while he is under an executory contract, before deed, is the possession of his vendor. *Core* v. *Faupel*, 24 W. Va. 238. In fact, in the eye of a court of law the vendee, having no deed conveying legal title, has no estate; he is but the vendor's tenant. Pomeroy on Contracts, section 314. Possession of a tenant is that of his landlord. 1 Am. & Eng. Ency. L. (2d Ed.), 810, note. For the purpose of this case a court of equity would so regard it. At any rate, a court of equity regards such a vendor and vendee as in a trust relation, and makes the possession of the vendee the possession of the vendor, where necessary to support the vendor's right as to other persons. *Clark* v. *McClure*, 10 Grat. 305. One of the improvements spoken of was made by a man named Kniffin begun about December, 1876. That possession has continued ever since under the Divine title. It is useless here to detail evidence. We think that the report of the commissioner finding that Divine and those under him "have proven under said color of title the actual, visible, notorious, continuous, exclusive and adverse possession of said land for a period of ten years prior to the institution of this suit," is justified in the evidence. It is a familiar rule that we cannot reverse a circuit court on finding of fact referred to a commissioner and approved by the court, unless not warranted by any reasonable view of the evidence. No deed was ever made for this Kniffin land. Possession under it enured for the long period from 1876 to the commencement of this suit in 1894, to the benefit of the title held by the trustees. As I have said taxes were paid during the whole time under that title. So, there was more than ten years actual continuous possession and payment of taxes for more than five years during such possession, thus complying with the demand made by the first clause in section 3 to confer upon that title the title of the former owners vested in the State by forfeiture. It cannot be said successfully that the "Kniffin improvement No. 1" was on the two thousand acre tract, and could not give the owners possession of other tracts; for the tracts being adjoining each other constitute one tract, and possession on one, one of the constituent tracts, extends over the others, because "Upon the question of adversary possession it is immaterial whether the land in controversy be embraced by one or several coterminous

grants of the older patentee; or one or several coterminous grants of the younger patentee; in either case the lands granted to the same person by several patents must be regarded as forming one entire tract." *Overton* v. *Davison*, 1 Grat. 212; *Rich* v. *Braxton*, 158 U. S. 212; *Sharp* v. *Shenandoah Co.*, 100 Va. p, 34, (40 S. E. 103). The same may he said of what is known as the "Isaiah Smith Place." That improvement was made as far back as 1882 and continued down. It is true that by deed dated 27th August, 1883, Divine conveyed the tract of two thousand five hundred acres, on which that improvement was made,. to George B. Childs; but George B. Childs conveyed it back to the owner of the Divine tax title by conveyance to Silas R. Divine, 27th August, 1883, and Silas R. Divine conveyed all the tracts to the Flat-top trustees, April 12, 1889, and tacking the possession under Divine and ·Childs to that of the trustees, would make more than ten years possession under the first clause of section 3, Art. 13. No deed was ever made for this Smith improvement, the legal title always remained with Divine and those claiming under him. Now, by force alone of the Kniffin and Smith parcels the trustees, before the institution of this suit, had become vested with the forfeited title residing in the state by reason of ten years possession and payment of taxes. This would be a bar to the plaintiff's suit.

But suppose we should say that the title under which the trustees claim has not the requisite *ten* years possession, and therefore could not hold under the first clause of section 3, Art. 13. Then, I say that it is very clear that they got the forfeited title under the last clause of that section, which gives the state title "to any person * * * for so much of said land as such person shall have had claim to and actual continuous possession of, under color of title, for any five successive years after the year 1865, and have paid all state taxes charged and chargeable thereon for said period." Now, the possession under the Smith and ·Kniffin improvements fully complies with this clause. Some of the other parcels settled upon, as stated above, here and there in these various tracts, were conveyed to the settlers by deeds passing legal title before the expiration of five years, and under the principles applied where adversary possession under the statute of limi-

tations is in question, the possession of the vendor would stop on the making of the deeds. It is a rule that if an owner of land conveys by deed the place or parcel of his land embracing his improvements or entire place of actual possession, his possession of the residue thereupon ceases. The rule of law which makes actual possession of part of a tract extend to its outer boundaries gives such extensive possession only because of actual possession in the place where actual possession is held, and when that goes from the grantor, he loses the foundation on which his constructive-actual possession of the residue rested. After the deed the grantee holds adversely to his grantor, but not before. *Ketchum* v. *Spurlock*, 34 W. Va. 597; 1 Cyc. 1129; *Chanler* v. *Rushing*, 38 Texas 591; *Sharp* v. *Shenandoah Co.*, 100 Va. 271, (40 S. E. 103). But, though, the possession of the owners of the residue of these lands ceased as to these parcels after their conveyance, yet some of these parcels came back to the owners. By deed July 23, 1888, a settlement called the Hood place was conveyed to the trustees, and the Martin-Chrictian place by deed April 25, 1888, and the Tilsen place by deed July 16, 1888, and the Benjamine Kniffin place No. 2 by deed August 31, 1888, and the Rose place by deed May 31, 1888. Some of these places began in actual occupation as far back as 1876. Say that we cannot count the time of poseession from the dates of the deeds to the settlers, about 1881, to the reconveyance of the parcels to the trustees, yet surely the possession of those which continued after their con-veyance to the trustees in 1888 would be counted, and it would be more than five years from such reconveyance to the commencement of this suit. The possession of these parcels under the trustees would give them possession of all the residue of the land, because possession of part is posses-sion of the whole. So, not only are the trustees protected by reason of the "Smith improvement" and the "Kniffin im-provement," as above stated, but they are protected ·by reason of their possession of those other parcels which had been conveyed away from the Divine title and came back to it by their conveyance to the trustees. Whilst the deed to Silas R. Divine excepted certain settled parcels, it did not except all, and those not excepted continued in possession from the first under the ten year clause. Besides several of

the excepted parcels having come back to the owners of the Divine title, the trustees, both the tracts not excepted and those reconveyed count more than the five years required by the five year clause. Argument has been made that there must be possession of each tract, and that possession of one of several adjoining tracts will not do. That would run counter to a vast volume of law declaring that the possession on one of two contiguous tracts extends over both. How can we so hold in opposition to *Overton* v. *Davison*, and other law cited above? And in this connection I remark that the trustees of the Flat-top Association purchased these tracts by executory contract from Silas R. Divine, October 12, 1887, which describes the tracts separately; but by the deed from Divine to the trustees, April 12, 1889, all the tracts were conveyed *in solido* as a unit, as one tract, by an outer boundary including all the tracts as one. Now, if the trustees could not call, as they can, upon possession under the Smith and Kniffin improvements, they could throw themselves upon the occupancy of those other parcels conveyed to them in '88, and make out five years' possession from the date of the deed of Silas R. Divine to them as, though this suit was brought in January, 1894, yet the trustees and their title were not brought before the court until September 14, 1894, more than five years after all the tracts were so conveyed as one tract by Divine to the trustees. So, this argument that there must be possession on each tract is without force in any view. And were this not so, I would go further, though not necessary for the decision of this case, and say that if such five years' possession did not exist at the institution of this suit, yet if it was full at the time of the decree, the land would be protected from sale.

There is another proposition on which I would sustain the claim of the trustees to take the benefit of the forfeiture, speaking herein for myself, but not at all passed on by the Court, because regarded unnecessary to be passed on. That proposition is, the possession of those parcels sold to individuals, both while their owners held under executory contract and under deeds, was all the time the possession of the owners of the residue, and extended over the whole area of all the tracts, the possession of part being of the whole, within the meaning of section 3, Art. 13, I emphasize within

the meaning of that section. For the present purpose, it is not a question of adverse possession under the statute of limitation. The section simply requires "continuous possession" under the title that is to draw to itself the forfeited title. The intent is to give a tract paying taxes and occupied the other title. If held by a vendee under an executory contract, it could not be disputed that his possession would be that of his vendor, and extending over the whole tract. Why should it be otherwise where the vendor has made a deed? He can say to the State: "Your bounty is given to me because I have paid taxes, and because there is a possession inside my boundary, and under shelter of my title. What difference does it make to the state that occupancy is by one holding my deed rather than one with a contract of sale? My grantee has my title; the tract is occupied by reason of my title. My grantee would hold adversely to me in case of contest between *me* and *him*; but that is not material between the state and me. It would not be adverse in my favor as against an adverse claimant; but under section 3 I am not an adverse claimant against the state, but only one claiming to be so circumstanced as to ask the state's bounty, and the state has promised to give her title to any one paying taxes and holding under his title. She has made no conditton denying me the benefit of my grantee's possession."

The argument is made that possession to give the transfer of state title must be by the very person claiming the transfer. To so hold is to say that possession by a tenant or purchaser under a contract of sale will not avail the claimant. This would compel us to give a new quality to possession, unknown to the long-time law. What matters it to the state, in bestowal of her donation under section 3, that a claimant has possession by tenant rather than himself? What one does by another he does himself. This contention seems based on the words "such person;" but that is not enough to compel us to place such a construction on the clauses as to defeat what must have been the purpose of the constitution.

It is argued in this case that the transfer of forfeited title under section 3, Art. 13, takes place either at the date of the adoption of the Constitution, August 22, 1872, or at the time when the titles became forfeited and vested in the state. We do not think so. The language of the first clause of the

section is that title vests in the described person, "for so much thereof as such person has, or shall have had, actual continuous possession of, under color or claim of title for ten years, and who or those under whom he claims shall have paid the state taxes thereon for any five years during such possession." Now, that language applies to possession present or future by the use of the present and future perfect tenses. The words, "shall have had," go back anterior to the adoption of the constitution and go forward to the future. How can we think for a moment that this clause intended to confine the transfer to persons having such possession at the adoption of the constitution, or who had made payment of taxes prior thereto? Would it not defeat the policy of the provision for transfer to say that in all the future no title forfeited after the date of the constitution should be passed to a person in the future coming under the first clause? It would be unreasonable, defiant of the letter and the plain intent of that clause. Or to say that the transfer must take place at the instant of the forfeiture would be equally ureasonable and contrary to the letter and spirit of the clause. To say that a title is forfeited to the State today, and then say that another claim of title which a year hence, or at any time hence, has had such possession and paid such taxes cannot get the benefit of the forfeited title, is contrary to the letter, purpose and policy of the clause. It is intended to be an ordinance, a law operating in all the future, and taking hold of events in the future. The third clause gives the state title to the described person "for so much of said land as such person shall have had claim to and actual continuous possession of, under color of title, for any five successive years after the year 1865, and have paid all state taxes charged and chargeable thereon for said period." Here the future perfect tense is again used, "shall have had," covering past and future time. And does it not say "any five successive years after the year 1865"? No matter when the forfeiture occurs. Under that clause, and under the first clause, whenever it happens that another title complies with the requirement of that clause the transfer comes. But it is said that if we hold that the transfer is not limited to the very moment of forfeiture, but another title after-wards having capacity to take can take the forfeited title at

a later date, these provisions of section 3, Art. 13, would run counter to the fourteenth amendment to the Constitution of the United States, because depriving the former owner of a right of property without due process of law. It is said that if a forfeiture and transfer occur at the same instant, then there would be no violation of the federal constitution. This argument rests on the theory that when a forfeiture occurs there is vested in the former owner a right of redemption before a decree subjecting the land to sale as forfeited, and that this right of redemption is a vested right of property, full fledged from the moment of forfeiture, and thus antedates the right of transfer of the forfeiture which follows conditions afterward occuring and inchoate only at the time of the forfeiture or afterwards. The answer to this is, that the right of transfer was put into the constitution as a right conferred by it, and no right of redemption is found in it. The right of redemption is found first in a statute passed after the Constitution, November, 1873. Acts 1872-73, chapter 134, section 13. Therefore this right of transfer is paramount to that right of redemption. Moreover, this statute right of redemption, by the very terms of the act, is made subordinate to the right of a transfer of a forfeited title given by Art. 13, section 3, because section 17, chapter 105, Code, makes the redemption not good to effect any right vested in another person by transfer under section 3 of Art. 13. So did said act of 1873. The very letter of the law under which this redemption right is claimed makes it subordinate to the right of a claimant to transfer of the forfeited title. Seeing that it would not do to rest this right of redemption upon statute law, endeavor is made by counsel to give it origin from the constitution by relying on section 39 of Art. 6. That section prohibits the passage of special acts, among other things for remitting forfeitures and releasing title to forfeited land. What has that to do with this question? This right of redemption finds no origin in the Constitution, as does the right to claim a transfer of forfeited title; but it originated in a statute passed after the Constitution, thus giving the right to transfer superior claim to the right of redemption, even if the act allowing redemption did not itself in words make it subject to the right of transfer. How can this right of redemption be made to soar higher than the

flight allowed it by the statute under which it exists? This right of redemption, though we give it the property quality, is subordinate to the right of transfer, and therefore, the Constitution in giving this right of transfer does not deprive the former owner or any one claiming the right of redemption of property. This section of the Constitution has been held not repugnant to the Federal Constitution in *King* v. *Mullin*, 171 U. S. 404, and *State* v. *Sponagle*, 45 W. Va. 415, and no distinction of this kind as to limitation of the time of transfer was suggested. The Constitution, section 6, Art. 13, declares forfeiture for omission, and at the same time the article grants the forfeited land to the other claimant; both forfeiture and transfer come of the same birth, the one equally binding as the other, and no right of redemption given. Statute law could not give redemption to the prejudice of the right to a transfer, even though the taking title come later to the circumstances enabling it to take a transfer. Where the right to take the benefit of the forfeiture is present, the right to redeem is not. Right to redeem exists only where the right to transfer does not.

I have endeavored to show that the Flat-top trustees acquired title by transfer of the forfeited title under section 3, Art. 13, of the Constitution. That does not involve the question of adverse possession. We hold, however, that the trustees, by reason of such possession as above stated, have title to the forfeited land under the statute of limitation. The Code, section 20, chapter 35, enacts that, "Every statute of limitation, unless otherwise expressly provided, shall apply to the state." This does away with the maxim "No time runs against the King" or State. This being wild land, not land used in administration of government, the statute runs against the state. *Foley* v. *County Court*, 54 W. Va. 16. The statute took title out of the state, and vested it in the trustees and for this reason the state could not ask a sale, as it did not own the land. *Atkins* v. *Spurlock*, 46 W. Va. 139; *Parkersburg* v. *Schultz*, 43 *Id.* 470.

The position is taken by counsel that the tax deeds under which the trustees make color and claim of title under section 3, Art. 13, Constitution, and the statute of limitation, do not make good color and claim. This position is utterly untentable. They are formal papers, giving boundary and

description, purporting to pass legal title, and *per se* importing claim of ownership and importing adverse possession *prima facie*. *Ketchum* v. *Spurlock*, 34 W. Va. 597. "Any written instrument, however defective, or imperfect, no matter for what cause invalid, purporting to sell, transfer or convey title to land, which shows the nature and extent of the party's claim, constitutes color of title within the meaning of the law of adverse possession." *Mullin* v. *Carper*, 37 W. Va. 216; *Swan* v. *Thayer*, 36 *Id.* 46; *Bennett* v. *Pierce*, 50 *Id.* 604; *Waldron* v. *Harvey*, 54 *Id.* 608, (46 S. E. 603). "It is settled law that a tax deed, though void, constitutes good color of title." *Bryant* v. *Grove*, 42 W. Va. 16; *Flanagan* v. *Grimmet*, 10 Grat. 421; 1 Cyc. 1095; *Lenis* v. *White*, (Va.) 20 S. E. 831. On the same principle it is clearly good "color" and "claim" of title under section 3, Art. 13.

It is clear that the claim of the trustees is superior in justice and real merit, because they and those under whom they derive title had, at the time of the decree, paid taxes of thirty years, kept possession, acted in actual good faith in their title. While the state slept a sleep of nineteen years before setting up title under the forfeiture, or attacking the tax sale, and the former owners slept a sleep longer than that of Rip Vanwinkle, paying not a cent of taxes in twenty-seven years. We think the higher title, in justice and law, demands the decree of the circuit court be affirmed.

*Affirmed.*