### FAY et ux. v. CROZER et al.

(Circuit Court, S. D. West Virginia.   September 12, 1907.)

**1. TAXATION—FORFEITURE OF LAND—NONPAYMENT OF TAXES.**

Under Code Va. 1860, c. 35, §§ 6, 10, requiring the clerk of the county court of each county to certify annually to the assessor for entry on the land books a list of all deeds and conveyances and an abstract of all grants from the land office recorded within the year ending on December 31st preceding, a state patent issued in January and subsequently recorded was not required to be included in the certificate for that year; and, under the statute providing that the omission of land from the land books for five consecutive years should work a forfeiture of the title, the time did not begin to run against the grantee of such land until the next succeeding year.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 45, Taxation, § 1664.]

**2. SAME—SALE OF LAND FOR TAXES—VALIDITY.**

A sale of land for taxes by a sheriff in West Virginia in 1869 was void for defects apparent on the face of the record, under the decisions of the Supreme Court of Appeals of the state, where the recorder failed to note on the lists of sales the day the sheriff returned such sale to his office, the affidavit of the sheriff to such lists was not dated, and the certificate of the sheriff was not signed by him.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 45, Taxation, §§ 1369–1374.]

**3. SAME—FORFEITURE FOR NONPAYMENT OF TAXES—CONSTITUTIONAL PROVISIONS OF WEST VIRGINIA.**

Const. W. Va. 1872, art. 13, § 6 [Code 1906, p. lxxxv], provides as follows: "It shall be the duty of every owner of land to have it entered on the land books of the county in which it or a part of it is situated, and to cause himself to be charged with the taxes thereon and pay the same. When, for any five successive years after the year 1869, the owner of a tract of land containing one thousand acres or more shall not have been charged on such books with state tax on said land, then by operation hereof the land shall be forfeited and the title thereto vested in the state." *Held,* that in view of the general policy of the states of Virginia and West Virginia to compel owners of land to pay taxes thereon or forfeit their lands to the state or to bona fide settlers thereon, as evidenced by nearly a century of previous legislation, rendered necessary by the evasion of taxes by the owners of large grants from the state of Virginia in the years during and following the Revolution, especially west of the Alleghanies, such constitutional provision imposed on the true owner of lands the duty of ascertaining within the time given, by judicial proceedings or otherwise, whether or not he was the true owner, and, if so, of having the same entered on the land books for taxation; that it operated to extinguish the title of a grantee of state lands, who, from the time of the grant in 1860, during 47 years, had paid no taxes thereon; and that it was immaterial that during such time there had been a void sale of the land for taxes to the state, in whose hands it was not taxable.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 45, Taxation, § 1664. Forfeiture for nonpayment, see note to Read v. Dingess, 8 C. C. A. 401.]

4. CONSTITUTIONAL LAW—DUE PROCESS OF LAW—TAX PROVISIONS OF STATE CONSTITUTION.

Such constitutional provision is not in violation of the fourteenth amendment to the Constitution of the United States, as depriving owners of their property without due process of law.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, §§ 891–906.]

## At Law. Action in ejectment.

Declaration in ejectment in this action was filed in this court at April rules, 1901, an order of survey subsequently directed and on November 13, 1906, in open court, a stipulation was filed by counsel representing the plaintiff and the trustees of the Crozer Land Association, the Houston Coal & Coke Company, and the Turkey Gap Coal & Coke Company, whereby it was agreed that the action should be tried at that term as to said parties and as to the undivided half interest claimed by plaintiffs in a certain portion of the land in controversy, fully identified by reference to the surveyor's map filed; that such trial should be by the court, in lieu of trial by jury, with like effect as if tried by a jury, and judgment rendered by instruction of the court to find for the prevailing party, with all right of appeal or writ of error in all respects preserved to the losing party. And thereupon said stipulation set forth an agreed statement of facts upon which trial should be had, which agreed statement of facts was made part of the record, and the case was, to the extent and between the parties indicated, submitted. These agreed facts, somewhat condensed, are as follows:

On January 3, 1860, the commonwealth of Virginia granted to the plaintiff Eliza T. Fay and Samuel W. Austin by patent a tract of 1,200 acres of land, situate in McDowell county, W. Va. At the time this grant was made, and ever since to the present time, Eliza T. Fay was under coverture, being the wife of the plaintiff William Fay. No part of said land so granted was ever sold by plaintiffs, nor any interest therein. This 1,200-acre tract was entered for taxation for the year 1865 in the names of Eliza Fay and E. F. Harman, and for the years 1866 and 1867 in the names of Eliza Fay and E. F. Harman, and for the years 1868 and 1869 in the names of Eli Fay and E. F. Harman. These years are the only ones from the date of the patent to the present time, in which this tract was so on the land books for taxation, and no taxes were ever paid on it by the grantees in said patent. In October, 1869, the sheriff of McDowell county sold this 1,200-acre tract, returned delinquent in the names of Eli Fay and E. F. Harman, for the nonpayment of taxes for the years 1865 and 1866, and at the same sale sold it delinquent in the same names for the nonpayment of taxes for the years 1867 and 1868. At both sales the state of West Virginia became the purchaser, and no redemption thereof has ever been made by Mrs. Fay or Harman, her co-tenant.

The trustees of the Crozer Land Association claim legal title to the larger part of the 1,200 acres in this way: Henry C. Auvil, commissioner of school lands for that county, on July 7, 1882, reported a tract of 5,000 acres (which included all the land involved, under the stipulation, in this trial) as waste and unappropriated. Upon his report the circuit court of McDowell county entered a decree directing him to sell this 5,000 acres, after first directing its subdivision into smaller tracts. He did sell, inter alia, 46 acres to J. W. Harman, 113 acres to William R. Belcher, and 1,281 acres to Straley, French & Welch. These sales were confirmed, and deeds were directed to be executed, and were executed and delivered, by said Auvil, commissioner, to said purchasers. These three tracts cover the part of the 1,200-acre tract involved in this trial under the stipulation. Fay and wife were in no way parties to the proceedings by which these three tracts were sold by Auvil, commissioner, as waste and unappropriated lands. These three tracts of 46, 113, and 1,281 acres by subsequent conveyances passed and vested for value in the defendants, trustees of the Crozer Land Association, and from 1884 down to the present time have been substantially assessed for taxation, and never returned delinquent, in the names of said land association and Harman, and such taxes assessed have been paid. These three tracts of 46, 113, and 1,281 acres were

conveyed by Harman, Belcher, and Straley, French & Welch to Samuel A. Crozer, who subsequently conveyed them to the trustees of the Crozer Land Association. While they were held by Samuel A. Crozer, he by deed of lease, dated December 12, 1887, leased a part to the Turkey Gap Coal & Coke Company, the property lines of which leasehold embrace the eastern portion of the land in controversy in this trial; and by a similar deed, dated December 16, 1887, he leased to the Houston Coal & Coke Company a part which adjoined the former lease and embraced the western portion of the land in controversy in this trial.

Said lessees went into immediate possession under their respective leases for the purposes thereof, and such possession has remained uninterrupted to the present time. The acts of possession of these lessees consist of developing and operating large and expensive coal and coke operations. On the exact land here in controversy two dwelling houses and a ventilating fan have been erected and used since 1894 or 1895, and coal headings or entries under surface have been driven by the Turkey Gap Coal & Coke Company. Timber has been cut since 1887 for mine purposes, and coal has been mined since 1893, under adverse claim of title.

Price, Smith, Spilman & Clay, for plaintiffs.
Brown, Jackson & Knight, D. J. Strother, and W. W. Hughes, for defendants.

DAYTON, District Judge, sitting specially, after stating the facts as above, delivered the opinion of the court.

The clean-cut issue in this case is whether the title of Mrs. Fay to the land in controversy has been forfeited, either by sale to the state or for non-entry for taxation on the land books. This being an action of ejectment, in which the touchstone principle is that the plaintiff can only recover upon the strength of his own title, and not upon the weakness of his adversary's, if such forfeiture has accrued, it becomes absolutely immaterial as to how the defendants hold.

At the threshold I am compelled to express my admiration for the earnestness, thoroughness, learning, and ability displayed by counsel on both sides in discussing orally and in briefs this issue, involving, as it does, some of the most difficult and perplexing questions that have confronted our courts during more than a century, in construing the land law system of Virginia and West Virginia. These propositions, quoted from brief of counsel for plaintiff, I think clearly set forth the reasons claimed by defendants for their claim of forfeiture:

"(1) Because this land was not entered upon the proper land books of Virginia and West Virginia for taxation for the five successive years of 1860 to 1864, both inclusive.

"(2) Because it was sold in October, 1869, by the sheriff of McDowell county, for the nonpayment of taxes assessed thereon in the names of Fay and Harman, for the years 1865, 1866, 1867, and 1868, and purchased by the state of West Virginia, and was not redeemed within one year after sale.

"(3) Because said land was omitted from the land books of McDowell county for the year 1870 and subsequent years, in the names of Fay and Harman, and has thereby become forfeited for nonentry for five successive years since 1870."

To meet the first two propositions counsel for plaintiff have ably argued:

First. That no forfeiture, under the law providing that omission for five successive years from the land books should work such, in fact

accrued prior to 1865, because sections 6 and 10 of chapter 35 of the Code of Virginia of 1860 required the clerk of the county court of each county to certify to the assessor for entry on the land books a list of all deeds, conveyances, and an abstract of all grants from the land office recorded within the year ending on the 31st day of December preceding in his county, and inasmuch as this patent bore date January 3, 1860, it was not to be certified for entry on the land books for that year, as not having been recorded "within the year ending on the 31st day of December preceding."

Second. That the sale of the land for nonpayment of taxes by the sheriff to the state in October, 1869, was void for defects apparent on the face of the record thereof, such as that the recorder failed to note on the lists of sales the day the sheriff returned these to his office, that the form of affidavit of the sheriff attached to such lists is not dated, and that the certificate of the sheriff was not signed by the sheriff.

I am inclined to hold both of these positions to be correct. In other words, although there may be and has been question as to the first, that the land under the law then in force depended upon the certificate by the clerk of the grant to the assessor for assessment, and could not be required to be placed on the books for 1860, whereby no forfeiture had accrued prior to 1865, yet I am inclined to concede this to be true; and as to the second proposition, that the sheriff's sales in 1869 were voidable for irregularities on the face of the records thereof, I think there can be no doubt under the rulings in such cases as Barton's Heirs v. Gilchrist, 19 W. Va. 223, Simpson v. Edmiston, 23 W. Va. 675, and McCallister v. Cottrille, 24 W. Va. 174.

It is true that under the so-called curative section 25 of chapter 31 of the Code of 1899 [Code 1906, § 884] these defects could no longer be relied on; but it has been expressly determined that this section is not retroactive, and therefore does not "cure" defects in prior sales. State v. Harman, 57 W. Va. 447, 50 S. E. 828.

To meet the third proposition of defense, the argument of counsel for plaintiff may be reduced to these propositions:

The land not having been forfeited legally, either for nonentry or by valid sale to the state for nonpayment of taxes prior to 1870, under and by virtue of section 19, c. 118, p. 157, Acts W. Va. 1863, which provides: "Real estate purchased in for the state at a sale for taxes shall not thereafter be entered in said books, but the auditor shall keep a register thereof"—was properly omitted from the books under the void sale in 1869 to the state, and was not subject to forfeiture because of such omission; that in 1882, in the proceeding by the commissioner of school lands, the state, by the attempted sale to the defendants' grantors, collected all the taxes which had been charged against said lands up to that time (in other words, all taxes due her up to 1884); that since that sale the purchasers and their alienees have paid all taxes since assessed; that this sale by the school commissioner in 1882 was absolutely null and void (a) because Mrs. Fay and the former owners were not made parties to the proceeding, which was one against waste and unappropriated, and not delinquent and forfeited, land; (b) because the land had never become forfeited to

the state, the state therefore had no title to sell and the school commissioner had no power to sell land other than that to which the state had title, and his sale was void as to the real owner. The conclusion reached is that the state has been paid her taxes, no forfeiture has accrued, the land belongs to Mrs. Fay, and the defendants can only claim a lien or quasi lien upon it for the taxes paid since their purchase.

The practical effect of this conclusion is a little startling, at least; for it holds this woman to have good title, although for 47 years she has not paid a cent of taxes, and logically could still have the same good title a century hence, if she cared to allow matters to remain in statu quo. This, too, in the teeth of a century of very numerous, determined, and positive constitutional and legislative enactments to compel payment by landowners of the taxes due from them.

"The reason of the law is the life of the law," and it is almost impossible to intelligently consider the complications arising here without to some extent considering the policy of the law running through the land legislation of the two Virginias. This legislation is both perplexing and in some particulars incongruous. It has caused many difficult questions and controversies to spring up, and the decisions of the different courts passing thereon have not been by any means always uniform and harmonious. Fortunately for me, able counsel for the defense have so clearly in a brief filed set forth the reason of the law and its policy I can do no better than to adopt and quote freely therefrom.

The commonwealth of Virginia, during the Revolution, with a plenitude of land and an empty treasury, with small resources for revenue (for her own lands paid no taxes into the treasury), to provide a "subject" for taxation, and, further, to interpose a barrier of outlying settlements between the tempting plantations of the "tidewater" and the marauding Indians to the west decided to put her lands on the market, and did so. The price theretofore had been $2 per acre. But, it being soon found that the well-to-do to the east were unwilling to leave their comfortable homes to literally risk their scalps, and that the old price was prohibitory to the adventurous, brave fellows who lived by their rifles and whose income was limited to proceeds from their pelts, a broader statesmanship conceived the plan of marketing the state's land at a nominal price (2 cents per acre); but, penny wise, adopted as the way for it that involving least possible expense to her. This plan, like all "cheap jobs," to an incalculable degree proved calamitous, with duplicate, triplicate, and quadruplicate titles, and boundary disputes without limit. Wherefore an absolute necessity arose for a forfeiting system, with an end in view of more vital importance to the commonwealth than any mere matter of revenue—the settling of her land titles, the security of her citizens in their homes, and protection for those who opened up the wilderness, tilled the soil, and supported the state.

In the beginning, when on revenue bent, there was established the land office, where whosoever would might buy to the limit of his means at 2 cents per acre as many acres of the state's lands as he chose, to

be located at his pleasure and without supervision or restriction, except that they be somewhere on the public domain. The entry was required to be surveyed at the purchaser's own cost under his own direction, and the "grant" followed, without inquiry as to whether of the "state's lands" or some other. "West of the Alleghanies" was then a mountain fastness, full of "savage beasts and still more savage men." Wherefore the market still remained dull, for want of settlers willing to face the risks in advance of protection. So, at the instance of speculators, the notorious "inclusive grants" were authorized, whereunder blanket surveys of immense acreages at minimum cost were, during the few years of their authorization, spread over the whole southwest country many deep, and by descriptions too indefinite and general to give to the subsequent bona fide settler information as to the location. As result, in time, as the home makers by degrees pushed out into the wilds with their small "improvements," locating here and there, giving value where none was before, they began to find themselves confronted with the blanket surveys long lain dormant, quietly awaiting their coming, only to appropriate the results of these labors and at the ripe moment to gather them in. When the awakening came, it was found the owners of the "big surveys" as a rule had eluded taxation, refusing to pay when assessed, but more frequently avoiding even assessment, and in either case withholding tribute to the government whose protection they demanded, leaving the whole burden to the actual settler, whose cow or mule was in touch of the tithe gatherer. As the situation developed, it was made more and more manifest how unjust, grossly inequitable, it was that the law-obeying citizens who developed the country and gave to it its value, who had borne the expense of the government and responded to its call for service civil and military, who had hazarded the savages and subdued the wilderness, should be driven from under the gourd vines of their planting and denied the fruit of their own fig trees, at the instance of those who had shirked every obligation, express or implied. Such were the conditions which originated the "system."

The "system," so called, was founded upon the universally accepted principle that every land grant by the state is upon the implied condition that the grantee takes subject to a charge in favor of the state for a just proportion of the cost of the maintenance of government, and that his tenure is subject to full, prompt, and faithful observance of his obligation. The poll tax and civil and military services are the measure of the citizen's personal obligation. The property tax is the incident to ownership, to the right of a continued holding; its prompt payment, the condition absolute upon which the patentee received and accepted the property from the commonwealth, and upon which he and those under him may enjoy its use. Upon breach of this obligation, the right of the state is instant to resume its own at its pleasure. For full and interesting statement of the above conditions and the causes, see Hutchinson on Land Titles, pp. 1, 2. We may be pardoned a brief quotation:

"The result of this loose, cheap, and unguarded system of disposing of public lands was that in less than 20 years after the adoption of the system near-

ly all of them were granted, the most part to mere adventurers, in large tracts or bodies, containing not only thousands, but in many cases hundreds of thousands, of acres in one tract. Often the grantees were nonresidents, and few of them ever saw their lands or expected to improve or use them for purposes other than speculation. The entries and surveys under warrants so cheaply and easily obtained were often made without reference to prior grants, thus creating interlocks, thereby covering land previously granted, so that in many instances the same land was granted to two or more different persons. Sometimes upon one survey actually located others were laid down by protraction —constructed on paper by the surveyors, without ever going upon the lands, thus creating on paper blocks of surveys containing thousands of acres, none of which were ever surveyed or identified by any marks or natural monuments. Thus, while the state was rapidly disposing of her large domain at 2 cents per acre, it was not attaining the main objects in view—the settlement of the country and revenue from the owners of lands. It was found that the grantees not only failed to settle upon and improve their lands, but in most instances they wholly neglected to pay the taxes due thereon, whereby revenue failed and the improvement of the territory was embarrassed and retarded. Nonoccupation of the lands and nonresidence of the owners made a resort to the lands themselves the only fund for delinquent taxes."

With the conditions and the reason such for the exercise of the right, the General Assembly of Virginia provided, first, for a sale by the sheriff for nonpayment of taxes, by a series of acts from 1781 to 1791, when, finding this to fail of the main purpose, it followed with provision for forfeiture for the nonpayment. This, too, after experience, proving short of the needs, because of the persistent neglect and refusal of many, especially nonresidents, to have their lands entered for taxation, in 1810 provision was made for forfeiture for nonentry. Of this Mr. Hutchinson says:

"We have seen that, so far, the policy of the state referred to the subject of lands delinquent for the nonpayment of taxes. Another class of cases was now discovered requiring strong measures."

In the preamble of the act of February 5, 1810, is recited:

"It being represented to the General Assembly that many persons omit to enter their lands on the commissioner's books, and thereby elude the payment of any revenue tax thereon," etc. Acts 1809–1810, p. 17, c. 16.

Wherefore it was thereupon enacted that lands not "entered" within 18 months next thereafter should be forfeited. This act was molded and remolded in varying form, and finally for the time being repealed February 9, 1814.

On April 1, 1831, the policy and prime purpose of the system, theretofore often alluded to in the several acts, was in plain terms expressly declared (section 8):

"And whereas, it is known to the General Assembly that in many cases lands, or parts or parcels of lands (especially such as have been granted and appropriated under the act passed at the May session, in the year 1779, entitled 'An act for establishing a land office, and ascertaining the terms and manner of granting waste and unappropriated lands,' and the subsequent acts on the same subject), which have heretofore been or may hereafter be returned delinquent for nonpayment of taxes, and which have been heretofore vested by law in the president and directors of the literary fund, or which by the provisions of this act shall, or may hereafter be, forfeited and vested in the said president and directors, are held by persons other than those for whose default they have been or shall be so forfeited, claiming bona fide, mediately or immediately, under grants from the commonwealth, and that the said actual

holders and bona fide claimants have settled and improved the lands so by them held and claimed, and have, moreover, paid all the public taxes thereon due and charged or justly charged to them; and it is therefore reasonable and just that the titles of such actual holders and bona fide claimants should be quieted and perfected, so far as the transfer to them of the rights vested in the said president and directors and therefore subject to the disposition of the General Assembly, can accomplish that object: Be it, therefore, further enacted," etc. Acts 1830–31, p. 91, c. 28.

The act of February 27, 1835, restored the provision for forfeiture for nonentry (section 1), prefacing the enacting clause with a recital of the occasion for it:

"And whereas, it is known to the General Assembly that many large tracts of land lying west of the Alleghany Mountains which were granted by the commonwealth before the 1st day of April, 1831, never were, or have not been for many years last past, entered on the books of the commissioners of the revenue where they respectively lie, by reason whereof no forfeiture for the nonpayment of taxes has accrued, or can accrue, under the existing laws, the commonwealth is defrauded of her just demands, and the settlement and improvement of the country is delayed and embarrassed: for remedy whereof, * * *

"Be it further enacted, that all right, title and interest which may hereafter be vested in the commonwealth by virtue of the provisions of the section of this act next preceding herein, shall be transferred to and absolutely vested in any and every person or persons, other than those for whose default the same have been forfeited, their heirs or devisees, who are now in actual possession of said lands or any part or parcel of them, for so much thereof as such person or persons have just title or claim to, legal or equitable, bona fide claimed, held or derived from or under any grant of the commonwealth, bearing date previous to the 1st day of April, 1831, who shall have discharged all taxes duly assessed and charged against him, her or them upon such lands," etc.

Acts 1834–35, pp. 11, 12, c. 13, § 3.

Next followed the acts of 1837, 1841, 1842, 1844, and 1846, reiterating the above, and whereunder the state disposed of those of the lands so acquired, not by operation of law transferred to junior bona fide claimants; and, in emphasis of the absoluteness of the transfer of title by such forfeiture, the General Assembly by act (1838) vested directly in Peter Dumas the "Swann title" to over 2,200,000 acres of forfeited lands—not by way of release to the "former owner," but by "transfer to" Dumas, theretofore a total stranger to the title.

By the act of April 12, 1852 (Acts 1852, p. 18, c. 18), the forfeiture and vestiture of title in the adverse claimant was again reiterated, and lands forfeited for nonentry, not so transferred to claimants, were made open to entry, survey, and grant; and so, too, the acts of March 20, 1858. And see Code 1849, and Code 1860, c. 114. By this act of 1852 express provision was made whereby the claimant might, should he desire an adjudication, file his petition in the circuit court and have his right determined, and so absolute was considered the forfeiture that, while the prosecuting attorney and auditor were required to be parties, the former owners were not, though required to be named in the petition so far as known.

The foregoing statutes were often under consideration by the Court of Appeals of Virginia and of this state, and have always been sustained, and the forfeiture held to be absolute and complete upon the failure to enter the lands and pay the taxes due and damages accrued.

No requisition or judicial proceeding or finding of any kind was required to consummate the forfeiture. Staats v. Board, 10 Grat. (Va.) 400; Hale v. Branscum, 10 Grat. (Va.) 418; Wild's Lessee v. Serpell, 10 Grat. (Va.) 405; Smith v. Chapman, 10 Grat. (Va.) 469; Levasser v. Washburn, 11 Grat. (Va.) 572; Atkins v. Lewis, 14 Grat. (Va.) 30. Also by the Supreme Court of the United States, approving the foregoing cases; i. e.:

"Forfeiture in such a case became absolute and complete by the failure to enter and pay the taxes on the land and the damages in the manner therein prescribed, and no inquisition or judicial proceeding or inquest or finding of any kind was required to consummate such a forfeiture." Armstrong v. Merrill, 14 Wall. 120, 20 L. Ed. 765.

The evils so sought to be remedied were peculiarly rank west of the Alleghanies; and as the omitted speculative surveys were in large degree held by the wealthy in the east, and the occupants (those needing protection) lived west of the mountains, the stronger east withdrew the protection of the beneficent acts—part of the tyrannous treatment which ultimately resulted in the division of the state.

So soon as West Virginia became a state, the people, mindful of this, as well as of other grievances suffered at the hands of a General Assembly dominated by hostile interests, in their first Constitution, first abolished the land office and its attendant evils, then adopted drastic measures for the future after due warning given and a day of grace, having first, in token of the "jubilee year," exonerated all lands owing $20 and under and all omitted lands of 1,000 acres or less, and further extended to all others as matter of favor, not "right," five years for entry, assessment, and redemption. Promptly at the expiration of the five years so allowed the Legislature proceeded to act (Acts 1869, p. 90, c. 125, § 7), reviving all the remedial features of the earlier acts and adding thereto. See Code 1868, c. 31, § 34:

"It shall be the duty of any person owning any real estate to cause the same to be entered on the land books of the proper assessor, and charged with the state taxes thereon not charged to the owner for the year 1832, or any year thereafter, heretofore, or hereafter, not released, paid, or in any manner discharged, which were and shall remain properly chargeable thereon. When any person owning real estate has not, or shall not have, for five successive years, been charged on such books with such taxes on such real estate, the same, and all the title, right and interest of the owner, legal and equitable, thereto, shall, without any proceeding, be absolutely forfeited to and vested in this state; provided, however, that such owner may, within one year after the passage of this act, cause such real estate to be charged with such taxes, chargeable for any such years heretofore, and thereby prevent a forfeiture for such years."

"All the estate, title, right and interest which has vested or shall vest in this state, or become irredeemable under the provisions of this chapter, shall be transferred to and vested in any person (other than those for whose default the same may have been returned delinquent or forfeited, their heirs or devisees), for so much thereof as such person may have title or claim to," etc.

"All the real estate forfeited as aforesaid, and not so transferred and vested, shall be sold for the benefit of the school fund."

It will be seen that by this act, not only no "redemption" was provided for, but in terms expressly inhibited by the imperative "shall be

sold," and, further, that, while the former acts were limited to omissions prior to 1832, this included all, past and future.

By the act of February 27, 1871 (Acts 1871, p. 183, c. 138), the time of one year for redemption was extended to two years from the passage of that act, subject to provision that no such redemption should impair any title transferred by law to any other person under the act of 1869. In 1872, so strongly was the importance of this provision impressed upon the people, and so vivid their experience with the Legislature of the old state, jogged by the warning contained in the act of 1871, that, to avoid further extensions and tamperings at the instance of influence and importunity, the people in even stronger language carried the "forfeiture clause" into the Constitution itself, together with the transfer of the forfeited title to the occupant taxpayer, and in almost identical language with the foregoing (article 13, § 6 [Code 1906, p. lxxxv]) :

"It shall be the duty of every owner of land to have it entered on the land books of the county in which it, or a part of it is situated, and to cause himself to be charged with the taxes thereon, and pay the same. When for any five successive years after the year 1869 the owner of any tract of land containing one thousand acres or more, shall not have been charged on such books with state tax on said land, then by operation hereof, the land shall be forfeited and the title thereto vested in the state. * * * And any owner of land so forfeited, or of any interest therein at the time of the forfeiture thereof who shall then be an infant, married woman, or insane person, may, until the expiration of three years after the removal of such disability, have the land, or such interest charged on such books, with all state and other taxes that shall be, and but for the forfeiture would be, chargeable on the land, or interest therein for the year 1863, and every year thereafter with interest at the rate of ten per centum per annum, and pay all taxes and interest thereon for all such years, and thereby redeem the land. or interest therein: provided, such right to redeem shall in no case extend beyond twenty years from the time such land was forfeited."

And by section 3 of this article [Code 1906, p. lxxxiv] it was provided that all titles vested in the state by forfeiture should eo instante and by operation of law be "and are hereby transferred to and vested in any person (other than those for whose default the same may have been forfeited or returned delinquent, their heirs and devisees) for so much thereof as such person has or shall have had actual, continuous possession of under color or claim of title for ten years and who or those under whom he claims shall have paid the state taxes thereon for any five years during said possession," or, if no such person, "then to any person (other, etc.) for so much of said land as such person shall have title or claim to regularly derive, mediately or immediately, from or under a grant from the commonwealth of Virginia or this state, not forfeited, which but for the title forfeited would be valid and who, etc., has paid all state taxes, etc., for five years since 1865, or the date of said grant," etc., or, if there be none of either of the above classes, "then to any person who shall have had claim to and actual, continuous possession for any five successive years since 1865 of, 'under color of title,' and paid all state taxes charged or chargeable thereon for said period."

The status of the former owner under the above has been well defined by the state court in McClure v. Maitland, 24 W. Va. 561, 576, 581:

"The title to the land and all the right and interest of the former owner having thus by his default and the operation of the law become absolutely vested in the state and become irredeemable, she, having thus acquired a perfect title to and unqualified dominion over the land, had the undoubted right to hold or dispose of it for any proper purpose, in any manner, and upon any terms and conditions she might in her sovereign capacity deem proper, without consulting the ·former owner or any one else; for after the forfeiture had become complete, as it had in the case before us, the former owner had no more claim to or lien upon the land than one who never had pretended to own it. In the exercise of this perfect dominion over her own property the state saw proper to transfer and vest her title to so much of said land owned by her in any person, other than those who occasioned the default, as such person may have been in the actual possession of, or have just title to, claiming the same and was not in default for the taxes thereon chargeable to him. * * * And all the right, title, and interest of the former owner having been completely divested, he has not a particle of interest in the land, no more than if he had never owned it. * * * The whole history as well as the express language of this constitutional provision proves that it was the intention to bestow upon the former owner whatever part of the proceeds of sale might be actually paid or liable to be paid into the state treasury after the state had sold the land and paid all the taxes, costs, etc., out of the proceeds of sale, and that it was clearly not intended to give him any interest in the land or its proceeds until a surplus should be ascertained by the proceedings conducted alone by the state through her officers. 'Beggars must not be choosers' is a just maxim, and therefore it is the duty of the courts to see that the bounty of the state is not used to her detriment, by giving to this provision of her Constitution a forced construction and one that could never have been intended. I am, therefore, of opinion that said fifth section of the Constitution did not confer upon the appellant, Maitland, any claim or interest in the land, or any interest or right to participate in the prcoeedings for its sale, his right to the surplus proceeds not arising until after the sale."

And in Read v. Dingess, 60 Fed. 21, 8 C. C. A. 389, 397, it is held:

"The statute gives the right by its terms of redemption only after the state has commenced proceedings for sale of the forfeited land. But there is nothing in it setting a time within which the state must sell, or requiring it to sell at all. If the state desires to hold the land permanently as a state reservation, or park, or ·for public institutions, nothing in her legislation prevents it. It is only if sale is attempted that a right to redeem is given; and the state cannot be forced to sell."

For the person who may "take"—the claimant under "color" or "claim" to title—see Core v. Faupel, 25 W. Va. 239:

"The principal office of a 'claim' or 'color of title' is to define the boundaries and fix the extent of the adverse holding. If it is a mere claim of title, the adverse holding will be limited to the actual inclosure of the claimant. But if it is a deed or other paper title, and the possession is exclusive, it will be regarded as coextensive with the boundaries contained in such deed or paper. The 'color of title,' however, may be good or bad, legal or equitable."

As to the wisdom of the "system," see Wild's Lessee v. Serpell, 10 Grat. (Va.) 409, quoted with approval in McClure v. Maitland, 24 W. Va. 576:

"In Wild v. Serpell, supra, Judge Lee, in delivering the opinion of the court, says: 'Considering the peculiar condition of things in that portion of the state lying west of the Alleghany Mountains, and the serious check to population and the improvement of the country and the development of its resources growing out of it, a resort to the stringent measures of legislation that were adopted was, in my opinion, as wise and expedient as the constitutional power of the Legislature to enact them was clear and unquestionable.' Wild's Lessee v. Serpell, 10 Grat. (Va.) 409."

On the fourth Thursday in August, 1872, this constitutional provision became operative. By it all prior statutory provisions in conflict with it were swept out. An entire new condition was created. The act of 1869 (Acts 1869, p. 88, c. 125, § 7), first containing the provision, was legislative in character; here it became constitutional. "The head and the hoof, the haunch and the hump," of it was to compel the owner of land to have it entered on the land books for taxation. He was given more than two years substantially from the date of its adoption by the people to perform this constitutional requirement; for it gave him five years from and after the year 1869 to do so, which was equivalent to two years from and after the year 1872. It seems to me utterly immaterial whether the tract (if over 1,000 acres) had been prior to that time sold to the state under void proceedings or not. This constitutional provision required the true owner to determine for himself, within the time given, whether he was or was not the true owner of the tract, and, if he determined he was, "to have it entered on the land books * * * and to cause himself to be charged with the taxes thereon and pay the same." If there was any doubt about his being the true owner, he had need to be up and doing to settle the question by proper judicial proceeding, if necessary. If the clerk refused to enter it on the books, it was his duty to bring proper legal proceeding to compel him to do so. That he had right to resort to such proceeding is clear, because never yet has constitutional right and obligation arisen, but legal remedy to enforce that right and legal aid in discharge of that obligation necessarily followed. The courts, per force of their oath to support the Constitution, had necessarily to supply such legal remedy. To my mind, when it thus became a constitutional duty of the owner to "have entered" his land within five years after 1869, it is no answer to say that by a prior statute (section 19, c. 118, p. 157, Acts 1863) the assessor was authorized to omit it, and became, therefore, in effect clothed with judicial power to ascertain and determine the validity of tax sales and who was or was not the true owner of the land. I admit, to establish such a condition, under conditions existing and that have existed, would be a practical absurdity. But no such condition can exist or be created by this statute as against this constitutional requirement.

In letter and spirit all statutory provisions antagonistic to constitutional ones must yield and stand aside. It is true the assessor may refuse to perform his duty in this regard, as any ministerial officer is like to do. He might refuse the true owner to enter his land, when asked by him to do so. On the other hand, he might in the name of the former owner enter land that had been properly theretofore sold for taxes, and the true ownership thereby vested in another. In either case the remedy to all was open to have corrected by judicial proceeding the error of his ministerial acts, and the liability of error on his part could not excuse the obligation upon the part of the owner himself to do all things necessary to comply with that obligation. The penalty provided by this constitutional provision for failure to comply with its requirements within five years from 1869 is clear and positive— the absolute, immediate forfeiture of the land to the state, **ex proprio vigore.**

156 F.—32

As an independent proposition, if I were called upon to reconcile section 19, c. 118, p. 157, Acts 1863, which was incorporated in the Code of 1899 in section 23, c. 29, with this section 6, art. 13, of the Constitution, bearing in mind the supremacy of the latter, I would simply read the former's meaning to be "real estate purchased for the state at a sale for taxes shall not be thereafter entered on the land books" in the name of the state, the purchaser, "but the auditor shall keep a register thereof." Thus construed, it would be simply a directory provision for the guidance of clerks and assessors, and in modification and harmony with those other statutory provisions requiring all lands "omitted" to be entered on the books, and all transfers by conveyance, etc., to be certified and entry made. Thus construed, its true purpose would be subserved; for it is clear, it seems to me, that the original purpose of the act was to destroy the idea that the state must keep her own lands upon the tax books and have them subjected to taxation for county, district, and municipal purposes. In this connection and as persuasive of this view, it is to be noted that very soon after the decisions of Sayers v. Burkhardt, 85 Fed. 246, 29 C. C. A. 137, and Totten v. Nighbert, 41 W. Va. 800, 24 S. E. 627, which apparently construed this statute as protecting the true owner from the constitutional obligation of causing his land to be entered on the books, regardless of at least a void sale to the state, the Legislature by Acts 1904, p. 44, c. 4, § 36, amended and re-enacted in Acts 1905, p. 297, c. 35, § 36, and incorporated in our last Code (1906) as section 720, amended the provision so as to carry out this original purpose of it, without giving to it the apparent effect of protection to owners as aforesaid. The provision so amended and now in force provides:

"Real estate purchased for the state, at a sale for taxes, shall not be omitted from the land books, but no taxes shall be assessed thereon while the same remains the property of the state," etc.

Thus construed, there can be no necessity to hold the clerk or assessor to be clothed with judicial powers, and no impediment could be urged against their prompt compliance with the behest of the owner, or even claimant of ownership, seeking "to have his land entered for taxation in his name, himself charged with the taxes thereon, and to pay the same," as required by the constitutional provision. I am confronted, however, with the rulings in Sayers v. Burkhardt and Totten v. Nighbert, which it is insisted make such construction impossible. I simply, therefore, make the suggestion with all deference. But, independent of my own views of this question, I regard the conclusion reached by me as inevitable for another reason. The Supreme Court of Appeals of West Virginia has so held in two well-considered cases very recently decided. These cases are Stockton v. Craig, 56 W. Va. 464, 49 S. E. 386, and Webb v. Ritter, 54 S. E. 484.

It is, however, earnestly insisted by counsel for plaintiff that these cases are in direct conflict with the cases of Totten v. Nighbert and Sayers v. Burkhardt. This may be true, although it is to be noted that the same judge rendering the opinions in Totten v. Nighbert and Stockton v. Craig strenuously insists in the latter that there is no con-

flict, but complete harmony. It is not necessary for me to express an opinion as to this, further than to call attention to the facts that these last two cases directly and positively decide the exact question here involved, after careful review of all former decisions, that there is no doubt or confusion in their rulings, and that they are the latest decisions of the court of last resort of this state, not only construing its Constitution and local statutes, but establishing by such construction a rule of property in this state. Under such circumstances, I regard it necessary, under decisions of the Supreme Court by which I am bound, to follow these local decisions, independent of any federal decision prior to their enunciation. Polk v. Wendall, 9 Cranch, 98, 3 L. Ed. 665; Williams v. Kirtland, 13 Wall. 306, 20 L. Ed. 683; Walker v. Marks, 17 Wall. 648, 21 L. Ed. 744; Board of Supervision v. U. S., 18 Wall. 71, 21 L. Ed. 771; Leffingwell v. Warren, 2 Black (U. S.) 599, 17 L. Ed. 261; Suydam v. Williamson, 24 How. 427, 15 L. Ed. 978; Lloyd v. Fulton, 91 U. S. 479, 23 L. Ed. 363; Green v. Neal, 6 Pet. 291, 8 L. Ed. 402. It must, however, always be remembered that this rule has no application when a question arises in a federal court as to whether a local law or decision violates the Constitution or laws of the United States. In such cases these courts must remember the supremacy of the federal laws and their solemn obligation to maintain them as supreme.

In this case it is insisted that this section 6, art. 13, of the West Virginia Constitution contravenes the fourteenth amendment of the federal Constitution. This question has been fully discussed by Brannon, J., in State v. Sponangle, 45 W. Va. 415, 32 S. E. 283, 43 L. R. A. 727, where it was held this article was not in violation of the fourteenth amendment, and this decision has been affirmed by that court consistently ever since by such cases as State v. Cheney, 45 W. Va. 478, 31 S. E. 920, State v. Swann, 46 W. Va. 128, 33 S. E. 89, and Webb v. Ritter (W. Va.) 54 S. E. 484. It has also been passed upon by the Supreme Court in two cases taken there from this court, and the same conclusion reached. King v. Mullins, 171 U. S. 404, 18 Sup. Ct. 925, 43 L. Ed. 214; King v. Panther Lumber Co., 171 U. S. 437, 18 Sup. Ct. 573, 43 L. Ed. 227. In view of these decisions, I must hold the provision not in conflict with the fourteenth amendment.

Finally, I cannot agree with counsel for plaintiff in the construction given to this section 6, art. 13, of the state Constitution in its application to the lands claimed by married women and others under disability. As I read it, whenever any owner of a tract of 1,000 acres or more does not have it entered on the land books for taxation for any successive five years after the year 1869, forfeiture for such nonentry becomes complete; but, in case of those owners under disability, redemption from such forfeiture so accrued may, within three years after removal of disability, be made, "provided such right to redeem shall in no case extend beyond twenty years from the time such land was forfeited." This being true, it seems to me the conclusion to be reached is plain. In 1869 this 1,200-acre tract of land was off the land books and not assessed with taxes. By express con-

stitutional requirement it was Mrs. Fay's duty, not later than 1874, to have it entered for such taxation. She did not do so. In 1875 it had been so off the tax books for "five successive years after the year 1869," and thereby became forfeited to the state. She had 20 years, or until 1895, to redeem. She did not do so. The void sale by Auvil, commissioner, in 1882, and the subsequent claim of defendants thereunder, cannot aid her, and in this action of ejectment is immaterial. She must present and recover upon a good and valid title of her own. No privity of title or claim has ever existed between her and the defendants. Their deeds from Commissioner Auvil, though void, were sufficient claim and color to base adverse possession upon, and in time enable them to acquire good title against her and the world.

There must be judgment entered for the defendants.