# CHARLESTON.

BOARD OF EDUCATION OF TOWN DISTRICT, RALEIGH COUNTY
*v.* J. W. DUNKLEY.

Submitted October 11, 1921.   Decided October 18, 1921.

1.  LANDLORD AND TENANT—*Tenant May Not Dispute Landlord's Title Without First Surrendering Possession.*

    A tenant is not allowed to dispute the title of his landlord, without first surrendering possession; and while in possession he may not collude with another, who claims to hold an adverse or hostile title, and thus prejudice the right of possession of his landlord.   (p. 251).

2.  SAME—*When Tenant Disclaims Under Lease or Attorns to One Other than Landlord, His Possession Becomes Tortious and Adverse, and Landlord May Dispossess.*

    When a tenant disclaims to hold under his lease, and brings notice of that fact to his landlord, then the relation of landlord and tenant ceases, and he becomes a trespasser and his possession is adverse, and the landlord may at once dispossess him.   If the tenant claims the fee to be in another, or attorns to another, he must give notice to his landlord, and then his possession becomes tortious and adverse, and the right of entry in the landlord is complete, and he may sue at any time within the period of limitation.   (p. 251).

89 W. Va.

3. SAME—*Purchaser from Landlord Succeeds as Landlord of Tenant Holding Premises.*

> A purchaser of land for value on which there is a tenant holding under the vendor succeeds his vendor as landlord of that tenant, unless there is a stipulation to the contrary; and if the tenant desires to repudiate his tenancy and to make his occupancy adverse he must give notice thereof to his new landlord and refuse attornment. If he does not do so, and continues under the lease without such notice and without protest, the relation of landlord and tenant continues and remains unimpaired. (p. 253).

Error to Circuit Court, Raleigh County.

Action by the Board of Education of the District of Town, Raleigh County, against J. W. Dunkley for unlawful detainer. Verdict and judgment in favor of the defendant, and plaintiff brings error.

*Reversed and remanded.*

*Bumgardner & Preston, Ben H. Ashworth, David D. Ashworth,* and *David Lilly,* for plaintiff in error.

*C. M. Ward* and *W. H. File,* for defendant in error.

LIVELY, JUDGE:

From a verdict and judgment in an action of unlawful detainer in favor of the defendant, plaintiff prosecutes this writ of error.

The controversy arises over possession of one acre of land in or near the city of Beckley, on which is erected a frame dwelling house. It appeared that the Beaver Coal Co. deeded this tract of land in the year 1901 to the Beckley Seminary to be used for educational purposes, or as a playground or park in connection with the Beckley Seminary. The Beckley Seminary took possession of the land and caused the brush and some timber to be removed therefrom, and in the year 1905 erected a dwelling house thereon, which dwelling house was occupied by defendant at the time this action was instituted. In the year 1907 the Beckley Seminary conveyed this acre of land to the Christian Women's Board of Missions, a corporation, for educational purposes. A short time thereafter this last grantee erected a building on some land

89 W. Va.

nearby which it had purchased from other grantors, and conducted a sectarian school therein until the year 1917. About the year 1915 the Christian Women's Board of Missions employed the defendant as janitor of their school buildings and put him in possession of the house on the lot of land in controversy as its tenant.   He was paid a stipulated price per month, including the use of this dwelling house, for his services.   In Ocotober, 1917, the Christian Women's Board of Missions deeded this one acre of land in controversy to plaintiff, the Board of Education.   According to the testimony of two members of the Board of Education, they retained the defendant as janitor for their school buildings and permitted him to remain in the dwelling house for about two years after they obtained title to the property.   During all this time the Board paid the electric light, water and fuel bills for this house.   The payment of these bills by the Board is not in dispute.   In the early part of the school year of 1919, the School Board before that time having erected a new school building, desired the defendant Dunkley to clean up the old Institute building, for which he had previously acted as janitor and which was near the lot of land in controversy, for the purpose of using the same temporarily until the congestion of pupils terminated, and, through its secretary, Mr. Ashworth, employed Mr. Dunkley to do that service, including janitor service.   For this service defendant claimed $75.00 per month, including rent, and rendered a bill for 7 weeks work amounting to $131.25, and wrote the Board a letter to that effect, saying that this bill was due November 31st, and "I would like to have this as soon as possible as I need it to settle my bills, and oblige, this statement is true and correct."   In the fall of 1919, the Board, by its record, directed Mr. Ashworth, its secretary, to notify defendant to vacate the property on January 1, 1920.   The secretary testifies that he verbally notified defendant to that effect, and afterwards, about the 26th or 27th of February, 1920, served a written notice on him to vacate the house on or before the 1st of April, following. To collect his account of $131.25 for cleaning and janitor service, defendant sued the Board of Education, and it appears that his evidence in that suit was taken down by a shorthand reporter.   He was asked this question, "What was your con-

tract with the Board of Education?'' Answer: ''It was only a verbal contract. They were to pay me $75.00 per month and give me my rent 12 months a year; the $75.00 from the time school commenced until it closed. I commenced generally a week before the school commenced to get everything ready and then a week after school closed cleaning up.'' He was then asked, ''Whom did, you have that arrangement with?'' Answer: ''With the Board of Education.'' He was also asked: ''Did you pay the Board any rent for July, August or September, 1919?'' Answer: ''No; but I worked the following year over there, all the year, and my rent run from September until September.'' Question: ''You mean the previous year?'' Answer: ''Yes, I mean the previous year.'' In the trial of this unlawful detainer case the witness Dunkley, the defendant, was confronted with this testimony and asked if he made those statements, and he replied, ''That was the contract I had with the C. W. B. M.'' He was asked if he had made that statement in the former trial and he replied, ''If that is my testimony I suppose I did, but I was mistaken in the people it was made with.''

Defendant, to maintain the issue on his part, testified that he had gone into his house in the year 1915 under a contract with an agent of the C. W. B. M., and that a Mr. Howell, who was the last agent of the C. W. B. M., went away to sell the property and that he was told by Howell that the property would go back to a Mr. T. K. Scott, would revert back to him, and he was instructed to look to Mr. Scott for directions, and as his landlord. He testified that he never had any contract with the Board of Education with reference to renting the dwelling house in controversy, but that he served as janitor for their school buildings in the year 1917 and 1918. He then testified that in the fall of 1919 the Board did not intend to have school in the old building and not having sufficient room in the new building, the secretary of the Board came to him and asked him to clean up the old building, which he did and acted as janitor in the months of October and November, in all 7 weeks, and when he went to the Board to get his pay he was told that they would pay him his

bill when he moved out of the house, and he was notified to move out of the house by the first of the year, that is, January 1, 1920.    He refused to move and instituted a suit at law to recover his salary for seven weeks, in which suit he gave the foregoing testimony.    He testified that he had a verbal contract with T. K. Scott for the premises, and, being asked when this contract was made, he could not remember whether the contract was made before he received the notice on the 25th of February, 1920, to vacate, or not. He was not certain when that contract was made.    He testified that he had been paying rent to Scott but could not remember whether he had paid any rent in February, 1920, or not.    He was unable to say who had been paying the water, light and fuel for the house up to March, 1920.    He was asked if he had ever been the tenant of the Board, and replied, ''Not that I know of.''    T. K. Scott was examined as a witness for the defendant and introduced into the evidence a contract which he had made with the Beckley heirs in the year 1908, by which he was to survey out parcels of land which were supposed to belong to the Beckley heirs and which had not been disposed of; if necessary, to institute suits to recover the same, for which he was to receive a ½ interest in all of the lands so secured to the Beckley heirs in that way.    If he failed in any of the litigation he was to pay the costs; if he was successful in such litigation then the Beckley heirs were to pay ½ the costs, and they were then to execute to him a deed for a ½ interest in all of the lands so surveyed, recovered and secured to them.    Mr. Scott was a surveyor.    He also produced a deed which he had executed in the year 1909 to the C. W. B. M., conveying to that organization a one-half undivided interest in a two acre tract, which tract included the one acre in controversy, and which had a clause therein that if the property which was conveyed ceased to be used by the grantees for educational purposes, that his title, which he was then deeding, should thereby revert to him.    He also introduced the record of a suit instituted about the year 1910 or 1911 by the school commissioner against T. K. Scott and others, which was for the purpose, among other things, of declaring as forfeited to the State of West Virginia

these two acres of land, one acre of which is the subject of this controversy, for non-entry on the tax books in the name of John Beckley. Such proceedings were had in this suit that in about the year 1913 the court decreed that this land, these two acres, was forfeited to the State for non-entry in the year 1878; that the heirs of John Beckley had the right to redeem within a certain time by paying the amount of back taxes; and that upon their failure to so redeem the land would be sold by a special commissioner, who was appointed for that purpose. At this state of the proceedings the C. W. B. M. filed a petition, claiming that this two acre tract belonged to them and making certain allegations with reference thereto, which it is unnecessary to set out here, and on that petition an order was entered setting aside the former order giving the Beckley heirs the right to redeem, and enjoining the commissioner from making sale of the land. That proceeding stopped then, so far as this tract of land is concerned. The witness T. K. Scott introduced before the jury a deed dated the 15th day of April, 1920, from the Christian Women's Board of Missions to himself, making a reconveyance to him of the two acre tract, a one-half interest of which he had deeded to them in the year 1909. He then testified that defendant Dunkley was his tenant and that he had made him such by two written contracts, one executed or written about the 24th day of February, 1920, which was to run until the following September, and that on the last date a new contract had been made which extended the lease to March 1, 1921. It will be observed that this first contract was executed just about the time the notice of the Board of Education to give possession of the property was served on Dunkley. A motion was made to strike out and exclude from the jury all of the testimony of Scott, and the documentary evidence introduced by him, the deeds and school land proceedings, which motion was overruled and to which ruling plaintiff excepted.

The court seemed to be under the impression that the best title to the land would control the possession thereof, and tried the case on that theory. Three instructions were given for defendant, which proceeded upon that theory, all of which were objected to by the plaintiff, and it will only be neces-

sary to refer to one of the instructions to show upon what theory the court proceeded.   Instruction No. 2 is as follows:

"The court instructs the jury that if you believe from the evidence that the Christian Woman's Board of Missions, held the land on controversy in this case under a deed from Beaver Coal Company and also under a deed from T. K. Scott, and at the time it reconveyed the land so purchased by it from the said Beaver Coal Company to the Board of Education of Town District and also at the time it reconveyed the land which had been conveyed to it by T. K. Scott back to the said T. K. Scott, then the right to possession of the said land depends upon the title to the same and unless the jury believes that the said plaintiff has proved by a preponderance of evidence that its title is a better title than the title claimed by the defendant J. W. Dunkley they will find for the defendant T. K. Scott."

It will be observed that the plaintiff and its predecessors in title had possession and occupancy of this one acre tract since the year 1901.   It is not necessary to say in this proceeding whether its title was good or bad.   There is no controversy over the fact that from the year 1915 defendant was the tenant of the Christian Women's Board.   He says so expressly in his testimony. When confronted with this former testimony in the suit to recover for his services rendered in the fall of 1919 as janitor in the old building, in which he had stated that his occupancy was under the Board of Education, he said again that he had meant to say that his contract was with the C. W. B. M.   Being the lessee and tenant of the C. W. B. M. at the time they sold and delivered possession of the property to the Board of Education in 1917, by operation of law he became the lessee and tenant of the purchaser.   At common law this was not true. A tenant neither owed fealty nor rent to the assignee until he had assented to the assignment by attorning to the purchaser.   However, to remedy this inconvenient principle of the common law, a statute was passed, 4th Anne chap. 16, which made assignments of reversions valid in all cases without attornment.

This statute has been held to be effective in the states which have adopted the common law. 24 Cyc. .p. 1173-4. Under section 1 of chap. 93 of the Code, a grantee of any land let to lease shall enjoy against the lessee the like advantage by action or entry for any forfeiture or by action upon any covenant or promise in the lease which the grantor might have enjoyed.    The possession is the gist of this controversy and not the title to the land. It is not material to inquire who has the superior title, Scott or the Board.    Section 1, chap. 89, Code, expressly says that if the entry is lawful or peaceable and the tenant shall retain the possession of the land after his right has expired without the consent of him who is entitled to the possession, the party so turned out of possession, no matter what right or title he had thereto, or the party against whom such possession is unlawfully detained, may within three years after such unlawful detainer, sue etc.    It is elementary that the tenant cannot dispute the title of his landlord. In a suit for unlawful detainer against a tenant it is not necessary for the landlord to show any title.    An acknowledgment by the tenant that he went into possession under the landlord is sufficient to entitle the landlord to recover the possession.    Defendant could not dispute the title of the Christian Women's Board, nor will he be permitted to dispute that of its immediate successor, the plaintiff in this case. *Stover* v. *Davis,* 57 W. Va. 196; *Vass* v. *King,* 33 W. Va. 236; Tiffany, Landlord and Tenant, (1910 Ed.) sec. 209.    It is reasonably clear that defendant admitted his tenancy by special contract with the Board when he testified in the suit to recover his janitor's services, and wherein he rendered his account, including his rent.    His claim that in this suit he was talking about a contract he had with the Christian Women's Board does not relieve him, for he could not dispute the title in that way.    Moreover, Scott had no title to this land in 1917; his title, if it can be called such, was not obtained until the spring of 1920, when the lot was reconveyed to him. He has had no possession and attempts to get possession by entering into a written contract with Dunkley about the time that the Board of Education is trying to put Dunkley off.    If defendant desired to change his fealty and hunt up another

landlord after the Board had given him notice verbally or by writing to vacate the premises, it was his duty to first surrender possession to those under whom he had been holding. He cannot render his possession adverse except by a disclaimer and the assertion of an adverse right brought home to his landlord.   ''If he takes a secret lease or conveyance for the land from a third party claiming to be the owner, without the knowledge of his landlord, the character of his possession will not be changed.   So an adverse claimant, who gets into possession of the land by tampering with the tenant, cannot resist the landlord's claim where the tenant himself could not.'' *Voss* v. *King, supra; Harman* v. *Lambert,* 76 W. Va. 370. But it is claimed by defendant that Howell, the agent of the Christian Women's Board, told him when the property was sold to plaintiff in 1917, that he should look to Scott.   That direction could not avail against the Board.   It does not appear that any reservation of that kind came to the knowledge of the Board, and the possession delivered to the Board was the possession of the grantors under which defendant held his tenancy.   If defendant then desired to attorn to Scott, it was his duty to so notify the Board.   He did not do so, nor did he recognize Scott as his landlord nor pay rent to him until the Board had notified him to vacate, when he immediately enters into a written lease from Scott, and begins paying him rent.   During all of his tenancy the Board paid for water, light and fuel for the dwelling.   Suppose he had made no agreement with the Board except to act for it as janitor, and that the two members, who testified that his rent was included as a part of his wages, were mistaken. The simple fact that he was in the house as a tenant of its grantor when it bought the property and took possession would preclude him from denying the tenancy unless, at that time, he served notice that he was holding under another landlord.   It would be presumed that he was continuing as tenant. ''When a tenant remains in possession after the expiration of his original term, by permission, the implication is that he continues in possession under the conditions of the former demise.'' *Hobbs* v. *Batory,* 86 Md. 68; *Kendall* v. *Moore,* 30 Me. 327; *Commissioner* v. *Clark,* 16 Tiff. (N. Y.) 251.   If de-

fendant then desired to repudiate his tenancy and assert that he was holding under another landlord, that fact should have been brought home to the Board, and then the relation of landlord and tenant would have ceased, and it would have been the duty of the Board to evict him within the statutory time. Then his possession during the statutory time (3 years) would have been adverse and tortious. *Wild* v. *Surpell,* 10 Gratt 405; *Miller* v. *Williams,* 15 Gratt. 213; *Stover* v. *Davis,* 57 W. Va. 196.

There is no evidence, even of an inferential character, in the record that defendant ever repudiated his tenancy under the Christian Women's Board, or under its successor in title, the plaintiff, or ever recognized or proclaimed Scott as his landlord until after the notice to vacate. When he refused possession this suit promptly followed. He will not be allowed to deny the title and possession under which he took his tenancy. It follows that the defense of adverse title in Scott relied upon is not available in this action, and the evidence thereof should have been rejected; and that the instructions based on that defense should have been refused. The judgment is reversed, verdict set aside and a new trial awarded.

*Reversed and remanded.*