# CHARLESTON.

STATE v. T. K. SCOTT *et als.*

Submitted September 19, 1922. Decided September 26, 1922.

1. TAXATION—*Holding for Statutory Period by Adverse Possession of Lands Forfeited for Nonentry on Land Books Held Vested With Legal Title.*

   Where title to land has been forfeited to the state for nonentry on the land books, one, who is not responsible for such forfeiture, and who has had actual and continuous possession of such land under color of title for five successive years, and has paid all state taxes charged or chargeable thereon for said period, is vested with the legal title of the state thereto, under the last clause of section 3 of article 13 of the Constitution. (p. 520.)

2. SAME—*Educational Institutions May Acquire Title to Forfeited Lands by Adverse Possession Without Payment of Taxes.*

   Under section 57, chapter 29, Code, enacted pursuant to section 1, article 10 of the Constitution, property belonging to colleges, seminaries, academies and free schools, if used for educational, literary or scientific purposes, is exempt from taxation; and such institutions may acquire the title of the state to forfeited lands under the last clause of section 3 article 13 of the Constitution by actual and continuous possession thereof for five successive years, under color of title, without

91 W. Va.

the payment of taxes thereon for such period, since under the statute, such lands when so used, are not chargeable with taxes.	(p. 522.)

3.	ESTOPPEL—*Party in Possession of Lands, Acknowledging Title of Another Not Estopped From Disclaiming Under Such Title, if Original Entry Was Not Under Such Person.*

Generally, a party in possession of lands acknowledging the title of another is not estopped from subsequently disclaiming holding under such title, if the original entry was not under the person in whom the title is acknowledged.	(p. 524.)

Appeal from Circuit Court, Raleigh County.

Suit by the State of West Virginia against T. K. Scott and others. From a decree for the State, the City of Beckley and the Board of Education of the District of Town separately appeal.

*Reversed and remanded.*

*Ben H. Ashworth* and *Bumgardner & Preston,* for appellant Board of Education.

*C. O. Dunn* and *Ben H. Ashworth,* for appellant City of Beckley.

*C. M. Ward* and *W. H. File,* for appellee.

MEREDITH, JUDGE:

The City of Beckley, and the Board of Education of the District of Town, appeal from the decree of the Circuit Court of Raleigh County, Special Judge, A. P. Farley, presiding, of date, December 20, 1921. The controversy arises in a proceeding instituted by the State of West Virginia to sell for the benefit of the school fund two tracts of land in Raleigh County, one of 150 acres, the other of two acres. A demurrer to the bill having been sustained as to the 150 acres, and the plaintiff failing to amend, the bill was dismissed as to that tract, and we are concerned with the two acres only. From the description which appears in the bill, and the map filed with the record, we are enabled to identify this two acre tract as a triangular piece of land, approximately equilateral, which lies in the northwest corner of a rectangular plot of land known as Beckley City Park, the

base of the triangle extending along the northwest line of the Park a distance of 597.5 feet.

This two-acre tract is divided into two parts equal in area. One portion is known as Parcel No. 1 and is a rectangle within the triangle and lies along its base. Appellant, Board of Education, claims legal title to Parcel No. 1. The City of Beckley claims the right of redemption, along with certain heirs of Alfred Beckley, in the residue of the two acres. Scott and the heirs of Alfred Beckley rely upon the forfeiture alleged in the bill, and their consequent right of redemption in the two acres. In particular, Scott claims to be the grantee of an equitable one-half interest in the two-acre tract, by virtue of a contract entered into between the Beckley heirs and himself in 1908, and to be the reversioner in a conveyance made by him of the same interest to the Christian Women's Board of Missions, predecessor in title of the Board of Education.

The basis of the proceeding, as set forth in the bill, lies in the fact, that the two tracts, title to which became vested in Alfred Beckley in 1836, and after his death in his heirs, were dropped from the land books in 1878, and "have remained off the said land books up to the present time" and that the taxes for that period are unpaid and the land unredeemed. The defendants named in the bill, insofar as the two acres are affected, are T. K. Scott and 13 persons, all except Scott being heirs of Alfred Beckley, deceased. Eleven of these heirs and T. K. Scott joined in an answer to the bill, admitting the allegations as to title and forfeiture, and averred their willingness to redeem.

On September 16, 1911, the court referred the cause to M. L. Painter, who as special commissioner was ordered to ascertain the location of the lands, the year or years in which they were forfeited and the holder of the legal title at the time, the amount of taxes due thereon, the nature and priority of any liens and encumbrances, whether or not any person claimed the lands under Article 13, section 3, of the State Constitution, and the names of any persons interested in any judgments or liens against the property.

Painter submitted his report August 27, 1912, and the court, by decree entered September 2, 1912, confirmed it. This order, following the commissioner's report, fixed the amount of taxes due the State at $29.10, decreed the forfeiture of title to the State for the non-payment thereof, established the right of redemption in the thirteen heirs of Alfred Beckley named in the bill, and adjudged that unless redeemed within 30 days from the rising of the court, the lands should be sold by a special commissioner appointed for the purpose.

On October 21, 1912, before the sale authorized by the decree, the Christian Women's Board of Missions, a corporation of the State of Indiana filed a petition in the cause naming as parties defendant the plaintiff and defendants in the forfeiture proceeding, in which, in addition to reciting the institution of the cause, and the various steps taken therein, it alleged that it was not made a party to the suit, though it was in actual possession of the premises, and that by virtue of successive deeds from the Beaver Coal Company to the Beckley Seminary, dated December 20, 1901, and by the Beckley Seminary to the petitioner, dated November 25, 1907, the petitioner was the sole owner of a certain one-acre tract, described by metes and bounds, which one-acre tract, it alleged, was a part of the two acres described in the original bill. The petition further averred that the petitioner and its predecessors in title had been in actual, continuous, hostile, open, notorious, adverse and peaceable possession of said one acre of land under the aforesaid deeds, from December 20, 1901, to the date of the petition, clearing the lands and erecting buildings thereon. The petitioner further averred that since the date of the deed from the Beckley Saminary, it acquired from one, T. K. Scott, and continued to own an equitable one-half interest in the two acres, "including the one (1) acre of land which lies within the boundaries of the said two (2) acres of land and outside of the boundaries of the one (1) acre of land described in and conveyed to your petitioner and complainant by said Beckley Seminary, a corporation, as aforesaid and that it is

actually now occupying all of said two acres and at all times has been so occupying and using all of said two (2) acres at the time of and since the institution of the above entitled suit.'' Further recitals of the petition alleged that the petitioner and its predecessor in title, the Beckley Seminary, had used the lands only for educational, literary and scientific purposes, and that under the laws of the State of West Virginia, the property was therefore exempt from taxation, and that prior to the year 1901 all taxes from and including the year 1878 had been duly paid by the former owners thereof. The petition specifically denied that the land was left off the land books for the years 1902-1911, denied the forfeiture of title to the State, and denied the right of the several Beckley heirs to redeem the one-acre tract, and the right of the special commissioner to sell any portion or all of the two acres, all taxes due thereon having been paid; and concludes with a prayer that the petitioner be made a party to the suit, that the decree based upon the report of the commissioner, Painter, be set aside, the commissioner enjoined from selling under said decree, and that the petitioner be allowed to support the averments of the petition by proper proof.

On October 21, 1912, the court ordered that the Christian Women's Board of Missions be made a party defendant and that any action under the decree of September 2, 1912, be restrained until the further order of the court.

The cause slept until August 23, 1920, when the Board of Education filed its petition adopting the allegations of the former petition of the Board of Missions, its grantor under a deed dated October 8, 1917, and averred specially the actual possession and occupancy of Parcel No. 1. The prayer of the petition was that the Board of Education be declared the true owner of Parcel No. 1 and that the restraining order of October 21, 1912, be made perpetual.

To this petition T. K. Scott and the Beckley heirs filed their joint demurrer and answer, reaffirming the forfeiture of title as alleged in the original bill. They admitted the deed of December 20, 1901, from the Beaver Coal Company

to the Beckley Seminary, but averred that it was void, because of the absence of any right or color of title in the grantor. The adverse possession claimed by the Board of Missions was specifically denied. As to the conveyance of T. K. Scott, respondents alleged that by the terms of the deed in which he conveyed his undivided one-half interest in the two acres to the Board of Missions, it was provided that the land conveyed was to be used in connection with the establishment and maintenance of a church school on land adjoining, also owned by the Board. They alleged that such a school was erected and maintained until 1917, when it was destroyed by fire, after which the Board of Missions abandoned the use of the two acres, disposed of its holdings in the County of Raleigh, and that in pursuance of the reversionary clause in Scott's deed to it, the latter did on April 15, 1920, reconvey to him the one-half interest in question. The answer concluded with a prayer that the injunction be dissolved and that the respondents be permitted to redeem.

The above demurrer and answer was filed while the cause was again in the hands of Painter, commissioner, to whom it had been for the second time referred on June 15, 1921. Also, pending his second report, three-fourths of the Beckley heirs executed deeds of their interests in the two acres, some to the Board of Education, others to the City of Beckley. These bodies by an inter-partes conveyance, dated November 17, 1921, divided the property so that the Board should take Parcel No. 1, and the City should take the residue of the two-acre triangle. On December 8, 1921, Commissioner Painter filed his second report in the cause. In it he found the Board of Education to be the legal owner of Parcel No. 1, one acre, and the City of Beckley and those of the Beckley heirs who had not conveyed their interests to have the right to redeem the balance of the two acres, subject to the interest of T. K. Scott under a written contract with said heirs. Exceptions to this report were filed by Scott and the Beckley heirs, and by decree, dated November 20, 1921, the court sustained the exceptions so filed, and

·adjudged that T. K. Scott owns an equitable one-half undi-
vided interest in the two acres of land, and the City of Beck-
ley and the Board of Education, and heirs of Alfred Beckley,
deceased, who had not conveyed to the City of Beckley or
the Board of Education their interest in said land, own the
other one-half undivided interest, all of which parties were
accorded the right to redeem according to their respective
·interests, and with the further provision that in case of
failure so to do the land should be sold by a special com-
missioner appointed by the court. It is from this decree
that the Board of Education and the City of Beckley prose-
cute this appeal.

It will be observed that the half of the two acres known as
parcel No. 1 is claimed by the Board of Education under a
title distinct from that under which the city claims the
residue of the land. This title is derived from the convey-
ance executed by the Beaver Coal Company to the Beckley
Seminary in 1901. We thus have two similar but not iden-
·tical cases before us.

## Parcel No. 1 Claimed by the Board of Education.

As just related, this tract was conveyed in December, 1901,
by the Beaver Coal Company to the Beckley Seminary, as
one acre, upon the condition that the land was to be used
for educational or park purposes, else to revert to the
grantor. The minerals were reserved. On November 25,
1907, the Beckley Seminary conveyed the same tract to the
Christian Women's Board of Missions, which on October 8,
1917, in a deed in which the Beaver Coal Company and
others joined as grantors, conveyed the same to the Board
of ·Education, the present claimant.

Upon what right or claim of title the deed of the Beaver
Coal Company was founded we need not know. It probably
had no right, as none is shown. During the years 1902 to
1904 the tract was cleared, and in 1904 or 1905 a frame
residence was erected thereon. It was first occupied by
Prof. White, principal of the Beckley Seminary, who also
kept student roomers, and later by janitors who were em-

ployees and lessees of the Board of Missions and the Board of Education.

It is the contention of Scott that this parcel of land lies within the boundary formerly owned by Alfred Beckley and was forfeited to the State because it was dropped from the land books after 1878, until about 1909, when the two acres were again charged to Scott and the heirs of Alfred Beckley in pursuance of contract between Scott and these heirs, to which we will later direct attention. This may well be. The testimony of Curtis and others can leave little doubt but that the two-acre tract is a part of the original Beckley lands, title to which is traced in the record to the Commonwealth of Virginia. However, does not the possession of the one acre by the Board of Education and its predecessors, the Board of Missions and the Beckley Seminary, under the color of title afforded by the Beaver Coal Company conveyance vest a title in the Board paramount to any right of redemption claimed by Scott or the Beckley heirs? The Board rests its claim upon section 3 of Article 13 of the State Constitution, and especially the last clause thereof:

"Or if there be no such person, as foresaid, then to any person (other than those for whose default the same may have been forfeited, or returned delinquent, their heirs or devisees), for so much of said land as such person shall have had claim to and actual continuous possession of, under color of title for any five successive years after the year 1865, and have paid all State taxes charged or chargeable thereon for said period."

By virtue of this provision there is no doubt but that by actual and continuous possession under color of title of lands forfeited to the State and the payment of taxes thereon for five years, one, whose default has not caused the forfeiture may obtain the title from the State; and this is true though the deed which constitutes such color of title be void. *State v Harman,* 57 W. Va. 447, 50 S. E. 828; *State v. Coal & Oil Co.,* 86 W. Va. 256, 103 S. E. 50; *Jarrett v. Osborne,* 84 W. Va. 559, 101 S. E. 162. This is none the less true

though the deed be by a stranger to the title and the pos-
sessory period begins and matures pending the State's suit
to sell the land for the benefit of the school fund. *State* v.
*Thompson,* 77 W. Va. 765, 88 S. E. 381.

Was then the possession of the Board of Education and
its predecessors of the character contemplated by the Con-
stitution? There are two requisites, actuality and conti-
nuity. *State* v. *Haymond,* 84 W. Va. 292, 299, 100 S. E. 81.
From the testimony of witnesses and the averments of the
petition of the Board of Missions adopted by the Board of
Education, and uncontradicted by proof or pleading, we
find that at some time during the years 1901-1905, Prof. B.
H. White, as principal of Beckley Seminary, had Parcel
No. 1 cleared of underbrush and undesirable trees, and that
in 1904 or 1905, he, as agent of the Seminary, caused to be
erected on the lot a frame dwelling house, and occupied the
house as principal, at the same time keeping students as
boarders. It will be recalled that the Seminary's deed was
dated November 20, 1901. After the sale of the property
to the Board of Missions in 1907, White moved out of the
house, after which it was occupied by George Snider, the
janitor and lessee of the Board. At his death he was suc-
ceeded by J. W. Dunkley, also a janitor, who held under sim-
ilar terms. The property having been purchased by the
Board of Education in 1917, Dunkley was employed by the
latter body, and remained in the dwelling house as its lessee.
About 1919, Dunkley, through an agreement with Scott,
attempted to deny his tenancy under the Board and at-
torned to Scott. This arrangement gave rise to an unlawful
entry and detainer suit posecuted by the Board of Educa-
tion against Dunkley, which upon appeal to this court, was
resolved in favor of the Board. *Board of Education* v.
*Dunkley,* 89 W. Va. 245, 109 S. E. 247. Having taken
prompt steps to regain possession of the property, the at-
tempted attornment by the tenant can not be said to have
broken the continuity of the possession. 2 C. J. 114, cases
cited.

However, appellees maintain that by accepting the deed of T. K. Scott to an undivided one-half interest in the two acres in 1909, the continuity of the possession of Parcel No. 1 was interrupted. Assuming, though not ruling, that the five-year period had not expired at that time, this objection may be answered by calling attention to the many authorities which hold that an occupant may purchase an outstanding title without thereby interrupting the continuity of his possession. *O'Neal* v. *Boone,* 53 Ill. 35; *Ripley* v. *Miller,* 165 Mich. 47, 130 N. W. 345, Ann. Cas. 1912C 952; *Dean* v. *Goddard,* 55 Minn. 290, 56 N. W. 1060; *Mather* v. *Walsh,* 107 Mo. 121, 17 S. W. 755; *Meyer* v. *Hope,* 101 Wis. 123, 77 N. W. 720; *Winterburn* v. *Chambers,* 91 Cal. 170, 27 P. 658. It must be held in mind that the adverse character of appellant's possesssion is not in issue. "By actual and continuous possession and payment of taxes, one who has not caused the forfeiture may obtain the title from the State, not against her will, but agreeably to her will. He is invited and encouraged to comply with the conditions vesting the forfeited title in him." *State* v. *Haymond, supra.* Whether the Board of Missions held adversely to Scott, the Beckley heirs, or any other, save the State, is for the present purposes immaterial.

We have recalled enough facts to convince us that subsequent to the erection of the dwelling, at the latest, the possession of the Board of Education and its predecessors has been sufficiently actual and continuous to meet the tests fixed by the Constitution and the decisions of this court.

There remains another element of appellant's possession not yet considered,—the payment of taxes. No taxes have actually been paid either by the Board of Education or by its predecessors since 1901. Appellees, while admitting that under section 1, Article 10, of the State Constitution and section 57, chapter 29, Code, property belonging to colleges, seminaries, academies, and free schools, if used for educational, literary or scientific purposes, is exempt from taxation, nevertheless claim that failure so to pay on the part of the Board of Education and its predecessors bars any

claim it may advance under section 3, article 13 of the Constitution.

This position is founded apparently upon two theories. First, that the tax exemption provision is governed by strict rules of construction, and can not be so enlarged as to be considered in connection with the constitutional provisions for the acquisition of forfeited lands; and, second, that for the purposes of the statute, the property here involved did not belong to the institutions.

These theories as applied by appellees do not accord with our view of statutory analysis. "The rule of strict construction does not require limitation of legislative terms to their narrowest meaning, nor to any particular meaning. They are allowed such scope as is clearly indicated by the legislative purpose revealed by the statute in which they are found." *State* v. *Blazovitch,* 88 W. Va. 612, 107 S. E. 291. It has long been the policy of all the states to encourage institutions of the character mentioned in our statute by exempting them from the burdens of the property tax. The citizens derive an intangible compensation from their prosperity as important as the revenue in the tax treasury. We can not subscribe, therefore, to the proposition that an educational institution must, in order to comply with the provisions of section 3, article 13 of the Constitution, pay taxes from which it is exempted by our Constitution and statutes. To hold otherwise, would, we think, be a perversion of the principles involved.

In advancing the second phase of their contention, appellees make much of the word "belonging" used in the statute. They emphasize the absence of legal title in the appellant and its predecessors during the years subsequent to 1901. In this they forget the legislative intent in regard to exemptions. Exemptions are based not on ownership but upon the use made of the property, and the character of the owner is not a test. *Kansas Masonic Home* v. *Board of Com'rs.,* 81 Kan. 859, 106 P. 1082, 26 L. R. A. (N. S.) 702.

Little is said in argument as to the actual use to which the property in question was put. It has been shown that dur-

ing the period involved, the lot was used as a dwelling house site for, first, the principal of Beckley Seminary, and later the janitors of the Board of Missions and the Board of Education. At all times it has been used to further the educational work of these institutions, and it is scarcely necessary to apply the liberal rule laid down for us in our recent case of *In re Masonic Temple Society,* 90 W. Va. 441, 111 S. E. 637, to conclude that such use was of the kind contemplated by the exemption statute.

We have so far determined that the title to Parcel No. 1, forfeited to the State after the year 1878, became vested in the predecessors of the Board of Education under section 3, article 13 of the Constitution. But, say appellees, the Board is estopped to set up such a claim. They say that by accepting the deed of T. K. Scott in 1909, with the reversionary clause, the grantee, the Board of Missions, and its privies can not now assert a contrary title. We find the law to be otherwise. Whether such a general proposition be true or not, the overwhelming weight of authority, it seems to us, is that it has no application in a case where the grantee is already in possession claiming under another title. The Board of Missions was in possession when it accepted the Scott deed. One may for greater security purchase an outstanding claim without estopping himself to deny the title so purchased. 21 C. J. 1070, cases cited; Herman, Estoppel & Res Adjudicata, 2d ed. 1295; Bigelow, Estoppel, 387, et seq., and cases there cited.

This last objection being disposed of, we hold that the Board of Education is now vested with absolute legal title to Parcel No. 1, containing one of the two acres involved in the proceeding.

### *The One Acre Claimed by the City of Beckley.*

As heretofore stated, three-fourths of the Beckley heirs have conveyed whatever interests they held in the two acres to the City of Beckley and the Board of Education, who by agreement divided the property, the city taking the residue of the two-acre triangle not included in the rectangle known

as Parcel No. 1. No part of this residue is covered by the conveyance of the Beaver Coal Company.

The title to this residue was forfeited to the State some time after 1878, the heirs of Alfred Beckley retaining the right of redemption. The sole inquiry here is, do these heirs and the City of Beckley now possess the right of redemption, one-fourth and three-fourths respectively, as claimed by the city, the appellant, or is T. K. Scott vested with an equitable one-half of the right of redemption, as is claimed by him?

To answer this inquiry, we must look to the contract under which Scott claims. It is dated January 10, 1908, and is an agreement between Scott and the heirs of Alfred Beckley. It recites that Scott is a surveyor of lands, and the grant of 170,038 acres of land in Raleigh County to Andrew Moore and John Beckley, after which appear the following important paragraphs:

"WHEREAS, by a certain suit of partition between the heirs of John Beckley, deceased, and Andrew Moore, there was allotted to Alfred Beckley, deceased and conveyed to him as his portion of the grant aforesaid by deed from Samuel Clark, com'r, to the said Alfred Beckley, dated January 13, 1836, and of record in the office of the Clerk of the county court of Fayette County, West Virginia, in Deed Book...., page...., whereby lots Nos. 7, 3, 19, 11 and 12 were conveyed to the aforesaid Beckley, for a more particular description whereof reference to the aforesaid deed is here made, and,

"WHEREAS, the grantors herein are the children and heirs at law of Alfred Beckley, deceased, and as such, have an interest in any and all unsold portions of the lots of land aforesaid, and,

"WHEREAS, the said parties of the first part desire to have such unsold parts of the lots aforesaid, or either of them, if any there remain, located by survey or otherwise, and suits or actions at law instituted for the recovery thereof if the same be necessary, and WHEREAS, the said party of the second part is

advised as to certain unsold portions of the land within the lots aforesaid, or either of them and the said parties of the first part desiring that the same be located as aforesaid.''

There follows an agreement on the part of the Beckley heirs to convey to Scott ''a one-half (½) undivided interest in and to any and all unsold portions of land within the exterior boundary lines of the lots of land aforesaid, or either of them, which the said party of the second part may locate by survey or otherwise,'' Scott is further authorized to bring suits in the names of the grantors to recover unsold portions.

Thus stood the title in February, 1909, when Scott executed a conveyance to the Board of Missions of an undivided one-half interest in the surface of the two acres, for educational and school purposes, with the following reversionary clause:

"'The grantors agree that if the said party of the second part or its assignees shall complete the school building or buildings, on its land, lying adjacent to this strip of land and in connection therewith, on or before the first day of October, 1910, the said lot of land is not to revert to the parties of the first part, unless the said party of the second part, shall cease to use the lot of land hereby conveyed, in connection with its other lots adjoining the same for school purposes, and if said party of the second part, fails to use the same for school purposes then the lot hereby conveyed is to revert to the parties of the first part.''

Special attention is called to the numbers of the lots named in Scott's contract with the Beckley heirs. They are numbers 7, 3, 19, 11 and 12. No semblance of title, either legal or equitable, was ever vested in Scott in any other lot, though other lots were assigned to Beckley in the partition of the Moore-Beckley lands, notably lots 2 and 10. The controlling issue of fact then is: Are the two acres within the boundaries of the lots named? The testimony of Milton Curtis, civil engineer, answers the question. He states posi-

tively that the two acres lie within lot No. 2, a boundary covering 18,865 acres not referred to in Scott's contract. Scott, in his examination, when asked: "In which lot of the Moore and Beckley does this land lie?" replied: "I am not positive about that; I think it is 3." He later stated he did not know the boundaries of lot No. 3. No other witnesses were questioned upon this phase of the controversy. We must therefore accept Curtis' statement as true.

The Scott contract not affecting the two acres, it follows that Scott never had any right to redeem any part of the land in controversy. But his counsel contends the right to the two acres conveyed to the Board of Missions reverted to Scott because of the reversionary clause. The clause, we think, is broad enough to permit the use of the lot for educational purposes by the Board of Education, as assignee of the Board of Missions, so as to prevent a reverter to Scott. The Board of Missions was interested in maintaining the school so long as its particular field was not adequately covered by the public schools of Beckley, but when they furnished adequate facilities for the education of the children of the community, the Board of Missions very properly surrendered the field to them, and with it its school property. In the deed made between the Board of Education and the City of Beckley, the Board reserved the right to use for school purposes the portion conveyed to the city, and the record shows it uses it for a playground, so there has been no reverter to Scott of any part of the two-acre parcel. There could be no reversion to Scott under his deed to the Board of Missions, further than the mere right which he pretended to convey, and he had no interest or right and conveyed none, hence in any event none could revert to him. Certain it is, he has no right to redeem any of this land. The city does not claim the part of the two-acre tract outside of Parcel No. 1 save under the deeds from the Beckley heirs. Therefore, we hold that the title thereto is in the State, subject to the right of redemption in the City of Beckley and those Beckley heirs who have not parted with their rights to redeem.

We will therefore reverse the decree and remand the cause for further proceedings to be had in accordance with the principles herein announced and the rules governing courts of equity.

*Reversed and remanded.*